[Cite as *In re A.F.*, 2019-Ohio-4627.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


IN RE:                                          :

    A.F. and J.F.                          :          CASE NO. CA2019-01-005

                                          :          O P I N I O N
                                                    11/12/2019
                                          :


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. JN2016-0335 and JN2016-0336


Garrett Law Offices, Dawn S. Garrett, 9435 Waterstone Boulevard, Suite 140, Mason, Ohio 45249, for appellee

Caparella-Kraemer & Associates, LLC, Tyler W. Nagel, 4841-A Rialto Road, West Chester, Ohio 45069, for appellant

Marcelina Woods, P.O. Box 922, Mason, Ohio 45040, guardian ad litem


    **PIPER, J.**

    {¶ 1}  Father appeals the decision of the Butler County Court of Common Pleas, Juvenile Division, which granted legal custody of his children to their maternal aunt. For the reasons described below, this court affirms the juvenile court's decision.

    {¶ 2}  In September 2016, Butler County Children Services ("BCCS" or "the agency") filed complaints alleging that siblings A.F., age seven, and J.F., age six, were abused and dependent children. The complaints alleged that the children were in the legal custody of

Father who was living with his girlfriend ("Girlfriend"). Girlfriend was the mother of Father's younger children. In total, there were 10 children living in the home.[1]

{¶ 3} The children were believed to be present when Father allegedly attacked Girlfriend while Girlfriend was holding an infant child. Father allegedly had firearms in the home and had threatened to harm the children. The complaints alleged an extensive history of domestic violence in the home. The agency requested that the court grant temporary custody to the children's maternal aunt ("Aunt"). In an ex parte order, the court granted temporary custody to Aunt.

{¶ 4} The agency entered into case plans with Father and the children's biological mother ("Mother"), who had previously lost custody of the children. The goal of each case plan was reunification. Father's case plan required him to complete a domestic violence batterer's assessment and follow all recommendations, obtain stable housing, and demonstrate an ability to provide for his children. Mother's case plan required her to complete a psychological and domestic violence victim assessment and follow all recommendations, obtain stable housing, and demonstrate an ability to provide for her children.

{¶ 5} Shortly after removal, the agency moved the court to terminate Aunt's temporary custody of the children based on a failed home study. The failure of the home study was due to overcrowding at Aunt's home. The court removed the children from Aunt's temporary custody and the agency placed the children in foster care.

{¶ 6} Aunt thereafter made changes at the home relevant to the concerns raised in the home study. The agency conducted a second home study in November 2016, which was approved. The agency then moved the court to place the children back in Aunt's temporary custody. The court granted the agency's motion and the children were returned to Aunt.

---

1. The other eight children are not the involved in this case.

{¶ 7} In March 2017, the court held an adjudicatory hearing and found the children dependent. The court continued temporary custody with Aunt.

{¶ 8} The children remained in Aunt's temporary custody for nearly two years. During this time, Father obtained housing and employment and completed his parenting class. Father also completed his domestic violence batterer assessment. However, during the assessment he denied that he had ever been abusive towards a domestic partner. He was therefore deemed unsuitable for further services regarding domestic violence. Nonetheless, Father continued to have occasional police contact at his home, which involved calls for alleged domestic incidents with females.

{¶ 9} Mother did not complete her recommended services. She was unemployed through most of the two-year period. She obtained rent-free housing and a monthly stipend to pay toward utilities. However, she had to move out of her residence when the utilities were turned off. At the time of the hearing, Mother was living with her mother and caring for a younger daughter with significant special needs.

{¶ 10} Both parents were eventually allowed to exercise unsupervised parenting time with the children. Mother had the children on the weekends and Father had four hours each Sunday. There were a few instances where the children acted out while visiting with Mother. And there were concerns that Father was talking to the children about the custody case during his parenting time.

{¶ 11} In September 2017, Father moved for legal custody of the children. In March 2018, Mother submitted a proposed shared parenting plan which named both Mother and Father as legal custodians. In March 2018, the agency moved the court to grant legal custody of the children to Aunt.

{¶ 12} The matter proceeded to a multiple day hearing in September 2018. Mother, Father, Aunt, the children's guardian ad litem ("GAL"), Mother's family service worker, and an

- 3 -

agency caseworker testified. The GAL agreed with the agency position and recommended that the court grant legal custody to Aunt. The agency submitted numerous documents into evidence, including social summaries, police records, the November 2016 home study at Aunt's home, and the Aunt's statement of understanding concerning accepting legal custody.

{¶ 13} At the conclusion of the hearing, the court interviewed the children in camera. Subsequently, the juvenile court issued a written decision granting legal custody to Aunt and awarding parenting time to Father and Mother. Father appeals, raising three assignments of error.

{¶ 14} Assignment of Error No. 1:

{¶ 15} THE TRIAL COURT ERRED IN DENYING FATHER'S MOTION FOR LEGAL CUSTODY.

{¶ 16} Father contends that the juvenile court erred in denying his motion for legal custody because he completed all case plan services, was employed, and the children wanted to live with him. Father argues that the juvenile court premised its decision on unproven allegations that he was guilty of committing domestic violence.

{¶ 17} Legal custody proceedings vest in the custodian the right to have physical care and control of the child, subject to any residual parental rights and responsibilities that remain intact with the birth parents. *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, ¶ 14; R.C. 2151.011(B)(21). R.C. 2151.353(A)(3) provides that if a child has been adjudicated abused, dependent, or neglected, a juvenile court may award legal custody of the child "to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child." A juvenile court "may award legal custody to a nonparent upon a demonstration by a preponderance of the evidence that granting legal custody to the nonparent is in the child's best interest." *In re L.A.B.*, 12th Dist. Fayette No. CA2012-03-008,

2012-Ohio-5010, ¶ 12. "A preponderance of the evidence is evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it." *Id.*

{¶ 18} A juvenile court's custody determination under R.C. 2151.353 must be based on the best interests of the child. *In re K.B.*, 12th Dist. Butler No. CA2012-03-063, 2013-Ohio-858, ¶ 11. In determining the best interests of the child, the juvenile court must consider all relevant factors, including, but not limited to, the applicable factors set forth in R.C. 3109.04(F). *Id.*

{¶ 19} This court reviews the juvenile court's custody determination for an abuse of discretion. *In re S.K.*, 12th Dist. Butler No. CA2013-06-108, 2014-Ohio-563, ¶ 12. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). The discretion that a juvenile court enjoys in custody matters "'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *In re J.M.*, 12th Dist. Warren No. CA2008-12-148, 2009-Ohio-4824, ¶ 17, quoting *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988).

{¶ 20} Moreover, a challenge to the manifest weight of the evidence involves the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12. In a manifest weight challenge "the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Schneble v. Stark*, 12th Dist. Warren Nos. CA2011-06-063 and CA2011-06-064, 2012-Ohio-3130, ¶ 67.

{¶ 21} In denying Father's legal custody motion and granting legal custody to Aunt, the juvenile court's written decision reflects that it considered the relevant statutory best interest factors set forth in R.C. 3109.04(F)(1). With regard to R.C. 3109.04(F)(1)(a), the wishes of the child's parents, the court found that Father agreed with Mother's request for shared parenting and alternatively requested to be named sole legal custodian.

{¶ 22} Concerning the (F)(1)(b) subsection, the wishes and concerns of the children, the court noted it interviewed the children and had considered the GAL's recommendation to grant legal custody to Aunt.

{¶ 23} Concerning R.C. 3109.04(F)(1)(c), the children's interaction with those who may affect their best interest, the court noted that the children had been removed from their parents care on three occasions. In 2012, the children were living with Mother. They were found unsupervised. Mother was charged with, and convicted of, child endangering. The children were placed with Aunt and later returned to Mother's care. Three years later the children were again removed from Mother's care due to unsanitary living conditions. The children were placed in Father's care even though he had no contact with them for three years. The third removal occurred in this case.

{¶ 24} Mother exercised weekend visits with the children. However, Mother also was taking care of a younger child with significant special needs. The agency had concerns over whether Mother was providing the necessary care to that child. Mother had also recently lost utilities at her rent-free apartment and currently owed $3,000 to the utility company.

{¶ 25} Father exercised unsupervised visits with the children for four hours each Sunday. The GAL expressed concerns that Father was making the children promises if they would come live with him. Even more concerning, Father had custody of the children's half-brother. The half-brother was the victim of rape by Girlfriend's brother. Following the rape, the half-brother had allegedly perpetrated sexually on another child. Father testified that he

- 6 -

was unconcerned with the possibility of the half-brother perpetrating sexually on either of the children at issue in this case. He explained that the bedroom where J.F. would sleep was across the hall from his bedroom and he could look in whenever he wanted.

{¶ 26} The court found that Aunt was bonded with the children and had provided care and support to both children at various points in their lives. Aunt was living with one adult daughter and three other children. The agency reported that Aunt was providing for the children's needs.

{¶ 27} There had been reports that Aunt was using physical discipline against the children. Aunt denied this and the agency investigated. The agency found the claims unsubstantiated. Nevertheless, Aunt accepted education on physical discipline from the Family Preservation Program. The agency and the GAL recommended that Aunt be granted legal custody.

{¶ 28} Regarding the (F)(1)(d) subsection, i.e., the children's adjustment to home, school, and community, the juvenile court found that the children were attending school in a school district where neither parent resided. Both children were doing well in school and both were in special therapeutic programs to help them with their individual needs. Both were attending weekly therapy and participating in school sports.

{¶ 29} With regard to the (F)(1)(e) subsection, i.e., the mental and physical health of all involved persons, the court noted that Mother underwent several diagnostic assessments, including a domestic violence assessment at which Mother reported having suffered domestic violence, both physical and emotional, during her relationship with Father. The abuse included choking, hitting, and restraining her from leaving an apartment (telling her the only way she could leave was over the rail of a balcony). The treatment provider recommended that Mother participate in a full psychological evaluation. However, she did not do so for nearly a year. Mother had not engaged in various services on her case plan

and was disinterested in participating in those services. She had not maintained employment or stable housing and had not progressed in any of her treatment goals with the agency.

{¶ 30} Father had participated in the domestic violence screenings recommended by the agency but denied ever being abusive toward any partner. Therefore, he was found ineligible for batterer's programming, either because he was not a batterer or because he was in denial of being a batterer and would not accept treatment. The court noted that Father's denials of being a domestic violence perpetrator were inconsistent with the reports of his children as well as the domestic violence claims made by Mother. An evaluator for domestic violence recommended that if the children in the case credibly reported observing Father commit domestic violence then he was a threat to the children's safety and should not have any contact with them.

{¶ 31} A.F. had engaged in a diagnostic assessment and reported that Father hit Girlfriend with a gun and choked her while she held a baby. A.F. was diagnosed with post-traumatic stress disorder due to the trauma she had experienced at home. In addition to reporting observing domestic violence, A.F. stated she had also been the victim of physical abuse by her parents.

{¶ 32} J.F. was in treatment related to his exposure to trauma. Treatment providers diagnosed him with adjustment disorder. In May 2018, during Mother's parenting time, he made a suicidal gesture by wrapping a cord around his neck and attempting to hang himself.

{¶ 33} With respect to R.C. 3109.04(F)(1)(f), the parent more likely to honor and facilitate parenting time, the juvenile court found that Aunt had facilitated visits with Mother with no issue. The children had missed some visits with Father, which the Aunt indicated were the result of issues with her work schedule. Mother and Father had been exchanging the children without incident.

{¶ 34} Concerning the (F)(1)(h) subsection, the parent's history of criminal offenses or involvement with children services cases, the court noted that both children had been found dependent in the underlying case. The court reiterated its finding that Mother had twice been found to be a perpetrator of neglect of the children. Mother currently had custody of a younger child and the agency was concerned with that child's well-being.

{¶ 35} In consideration of any other relevant factor, the juvenile court found that Father had completed his parenting class but in doing so had challenged the information presented. Throughout the pendency of the case he had avoided services, gave excuses, and blamed others for his faults. Father refused to address whether he had any issues with domestic violence. He became agitated when the subject was discussed. Father dismissed his children's need for special assistance at school and testified that he only believed they needed those services so that Aunt could get social security funds.

{¶ 36} The court noted that the case had been initiated over concerns with Father's alleged acts of domestic violence towards Girlfriend. Father and Girlfriend denied that any domestic violence incident occurred in their home.

{¶ 37} In August 2018, nearly two years after the case had initiated, Girlfriend appeared at a police department with some of her children. There, Girlfriend's 12-year-old son made a written report indicating that he had lied to the police in September 2016 when he said that Father had assaulted Girlfriend. The Girlfriend told the police officer that she needed the report to have a custody case closed. The court found that the circumstances concerning this alleged recantation were not credible and gave it no weight.

{¶ 38} Father denied Mother's allegations of prior abuse when the two were romantically involved and called Mother a liar. However, Mother was consistent in her claims of abuse by Father and continued to maintain that it was true despite her request for shared

parenting. The court found that Mother was more credible than Father with respect to whether domestic violence had occurred.

{¶ 39} Mother explained her choice of legal custodian as "being between a rock and a hard place." Mother indicated her belief that only Father's female partners could be harmed by Father's actions. Thus, Mother did not recognize that children could also be harmed by observing domestic violence perpetrated on others.

{¶ 40} The court further noted that several police calls were made to Father's residence in the two years the case was pending. Those calls involved Father arguing with a woman at his residence, including one call to investigate the report of a female screaming "stop hitting me." Father denied any responsibility for these incidents.

{¶ 41} The court noted that it had some concerns with Aunt, specifically that she indicated that she felt that Mother and Father should be responsible for arranging for transportation for the children's parenting time. The court was also concerned with Aunt's work hours. However, the court found that Aunt had demonstrated a genuine commitment to the children and had ensured that their needs were met, and that, because of her, their lives had stability.

{¶ 42} After considering all factors, the court found that the preponderance of the evidence favored granting legal custody to Aunt over shared parenting or granting legal custody to Father. The court noted that both the GAL and agency recommended legal custody to Aunt, who had an approved home study and had signed a statement of understanding. On the other hand, the court noted numerous concerns with Father and Mother, and that Father had not addressed the concerns that led to removal.

{¶ 43} The court found that the children were doing well with Aunt and that maintaining the status quo was in their best interest. The court also found that it would allow parenting time with both parents on a regular basis.

{¶ 44} Having reviewed the record of the custody hearing, this court does not find that the juvenile court abused its discretion in denying Father's motion for legal custody. The juvenile court removed the children from Father's care based on allegations that he engaged in acts of domestic violence against Girlfriend, which acts were witnessed by his children and credibly reported to the authorities. That Father was not criminally convicted of these acts appears to be the result of the Girlfriend's failure to support a prosecution rather than the truth of the underlying matter. As noted by the juvenile court, the recantation by Girlfriend's son, shortly before the motion hearing, lacks credibility.

{¶ 45} Father's propensity for violence against his female partners was corroborated by Mother, who consistently reported physical and emotional abuse while in a relationship with Father. Father denied having any anger issues whatsoever and claimed he had never abused Mother or any other female partner. However, the juvenile court found him not credible. Father's testimony at the hearing, which could be described as repeated and overbroad denials of any personal issues, support the conclusion that he lacks truthfulness.

{¶ 46} For two years Father chose not to remedy the issues that led to the children's removal. He took no meaningful steps to demonstrate to the agency or the court that he placed his children's safety above his own self-interests. Even if he denied being a batterer, he could have, like Aunt, accepted education to show the agency and juvenile court he was willing to put forth effort to reunify with his children. He failed to do so. The greater weight of the evidence supports the court's conclusion that a grant of legal custody to Aunt, rather than Father, is in the children's best interest. This court overrules Father's first assignment of error.

{¶ 47} Assignment of Error No. 2:

{¶ 48} THE TRIAL COURT ERRED IN DENYING MOTHER AND FATHER'S JOINT REQUEST FOR SHARED PARENTING.

{¶ 49} Father argues that the court abused its discretion in not granting his joint request with Mother for shared parenting. Father contends that the evidence showed that both parents agreed to shared parenting and would cooperate with one another, that Mother had exercised her parenting time without concern, and that there had been no issues with exchanging the children.

{¶ 50} With regard to whether shared parenting is in the child's best interest, the trial court must consider the previously discussed best interest factors under R.C. 3109.04(F)(1) and the specific factors pertaining to shared parenting set forth in R.C. 3109.04(F)(2). *Adkins v. Adkins*, 12th Dist. Butler No. CA2016-12-227, 2017-Ohio-8636, ¶ 11. The juvenile court's decision reflects that the court considered each of the shared parenting factors.

{¶ 51} With respect to the (F)(2)(a) subsection, the ability of the parents to cooperate and make joint decisions, the court noted that Mother and Father did not communicate with one another and would not interact during parenting time exchanges. Additionally, Mother and Father did not agree concerning their history. Mother reiterated her claims that Father abused her during their relationship. Father denied Mother's claims and called her a liar.

{¶ 52} Concerning the (F)(2)(b) subsection, the ability of each parent to encourage the sharing of love between the child and the other parent, the court found that neither parent had interfered with the other parent's parenting time and both Mother and Father had acknowledged the other as having positive parenting skills.

{¶ 53} With respect to R.C. 3109.04(F)(2)(c), the history of or potential for domestic violence and child abuse, the court reiterated its findings concerning the history of domestic violence between Mother and Father.

{¶ 54} With regard to R.C. 3109.04(F)(2)(d), the geographic proximity of the parents to each other, the court found that Father was living in Cincinnati and Mother was living in Middletown. Mother had indicated she may move to either Dayton or Cincinnati. The

distance between Mother and Father's residence was not so great as to cause the court concern over the feasibility of shared parenting.

{¶ 55} Concerning R.C. 3109.04(F)(2)(e), the GAL's recommendation, the juvenile court noted that the GAL did not recommend shared parenting and instead recommended legal custody to Aunt.

{¶ 56} Based upon this court's review of the record, the juvenile court did not abuse its discretion in declining to approve the joint request for shared parenting. The evidence showed that the level of communication between Mother and Father concerning their children was minimal and would have been inappropriate for a successful shared parenting arrangement. Aunt corroborated Father's disinterest in communicating about his children. He would not respond to her attempts to communicate and she would never know when to expect him with the children after his parenting time.

{¶ 57} Even if the parents had better communication skills, shared parenting would not be appropriate for the reasons previously discussed in response to the first assignment of error, i.e., a grant of legal custody to Father was not in the children's best interest. With respect to Mother, she conceded that she was presently incapable of receiving legal custody because of her circumstances. The greater weight of the evidence therefore supports the conclusion that shared parenting was not in the children's best interest and the juvenile court did not abuse its discretion. This court overrules Father's second assignment of error.

{¶ 58} Assignment of Error No. 3:

{¶ 59} THE TRIAL COURT ERRED AS A MATTER OF LAW IN PLACING THE CHILDREN IN AUNT'S LEGAL CUSTODY IN CONTRAVENTION TO O.A.C. 5101:2.

{¶ 60} Father argues that the juvenile court lacked authority to grant legal custody to Aunt because the agency failed to submit an updated home study at Aunt's home. The home study admitted into evidence at the September 2018 hearing was performed in

- 13 -

November 2016. Father cites provisions of the Ohio Administrative Code, which he argues required the home study to be updated annually. Whether a juvenile court has authority to grant legal custody is a matter of law, which this court reviews de novo. *See In re K.J.R.*, 12th Dist. Clermont No. CA2010-01-012, 2010-Ohio-3953, ¶ 16.

{¶ 61} Ohio Adm.Code 5101:2-42 sets forth the regulations applicable to public children services agencies' ("PCSA") authority to place a child in a substitute home. Ohio Adm.Code 5101:2-42-05(C)(1) provides that a PCSA shall only place a child in the home of relatives or nonrelatives who are approved by the PCSA in accordance with the rules set forth in Ohio Adm.Code 5101:2-42-18. In turn, Ohio Adm.Code 5101:2-42-18(M) requires the PCSA to "[a]nnually, based on the date of the original approval, * * * complete a home assessment to assure that the placement continues to meet the requirements of this rule for approval of the placement."

{¶ 62} BCCS may have failed to adhere to these regulations if it did not perform an updated home study at Aunt's home. However, the failure of the agency to follow its own administrative regulations would not restrict the legal authority of the juvenile court to award legal custody of the children.

{¶ 63} The juvenile court's statutory authority to grant legal custody of dependent children is set forth in R.C. 2151.353(A)(3). Pursuant to that statute, the court may award legal custody to any person who, prior to the dispositional hearing, "files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings." In addition, the court must determine that a grant of legal custody is in the child's best interest and the

person receiving legal custody must sign a statement of understanding. R.C. 2151.353(A)(3); *In re K.B.*, 2013-Ohio-858 at ¶ 11.[2]

{¶ 64} These statutory requirements occurred and thus the juvenile court had the authority to grant legal custody to Aunt. While this court agrees than an updated home study would have been beneficial to the juvenile court in assessing the children's best interest, the lack of a more recent home study was not a bar to the authority of the juvenile court to make a legal custody decision. Accordingly, this court overrules Father's third assignment of error.

{¶ 65} Judgment affirmed.

HENDRICKSON, P.J., and RINGLAND, J., concur.

---

2. Father cites no Revised Code provision or case law authority that supports the argument that an updated home study is required to grant legal custody.