[Cite as *In re A.L.*, 2021-Ohio-1767.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| A.L. | : | CASE NO. CA2020-12-090 |
| | : | <u>O P I N I O N</u><br>5/24/2021 |
| | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 18-C000209

Buckley King LPA, Dalma C. Grandjean, James D. Miller, One South Main Street, Suite 1590, Dayton, Ohio 45402, for appellant

A. Aaron Aldridge, 130 E. Mulberry Street, Lebanon, Ohio, 45036, for appellee

B.L., pro se

**HENDRICKSON, J.**

{¶1} Appellant, C.P.W. IV ("Father") appeals from a decision of the Warren County Court of Common Pleas, Juvenile Division, denying his motion for legal custody of his daughter and granting legal custody of the child to appellee, R.M., the child's paternal grandmother ("Paternal Grandmother"). For the reasons that follow, we affirm the juvenile court's decision.

{¶2} A.L., born November 7, 2014, is the daughter of Father and B.L. ("Mother"),

who are unmarried. On August 20, 2018, Paternal Grandmother filed a complaint for legal custody of A.L. in the juvenile court. Paternal Grandmother alleged that Mother was homeless and abusing drugs and that Father was in the United States Marine Corps and stationed in North Carolina. The juvenile court placed A.L. in the emergency temporary custody of Paternal Grandmother and subsequently awarded Mother supervised parenting time with the child.

{¶3} On August 28, 2019, the parties resolved Paternal Grandmother's complaint for legal custody by entering into an "Agreed Entry." Pursuant to the Agreed Entry, Mother, Father, and Paternal Grandmother "agree[d] to share joint custody of the minor child." The agreement further provided that "[e]ffective June 1, 2019, both [Paternal Grandmother] and [Mother] shall be the residential and legal custodians. [Paternal Grandmother] shall be the residential custodian for school purposes." Under the terms of the agreement, A.L. resided with Paternal Grandmother, with Mother being granted supervised parenting time with the child for four hours one day a week for four weeks. Thereafter, Mother's parenting time would gradually increase to unsupervised overnight visits, contingent upon Mother "engag[ing] and complet[ing] drug treatment, maintain[ing] a residence, refrain[ing] from the use of illegal drugs and provid[ing] clean drug screens, and maintain[ing] employment or full-time education." The agreement further provided that Father, who was still in the military and residing in North Carolina, was to have parenting time as agreed upon between himself and Paternal Grandmother. The Agreed Entry was adopted by the juvenile court.

{¶4} The "joint custody" arrangement lasted approximately three weeks before Paternal Grandmother filed a Motion to Terminate Joint Custody, claiming that Mother was not abiding by the terms of the Agreed Entry. Paternal Grandmother sought legal custody of the child. Mother and Father subsequently filed competing motions for legal custody of A.L.

{¶5} A hearing on the motions was held before a magistrate on August 6, 2020. At this time, Paternal Grandmother indicated her support for Father's motion for legal custody. However, Paternal Grandmother moved forward with her own motion for legal custody as an alternative, in case Father's motion was denied. The magistrate heard testimony from Mother, Father, Paternal Grandmother, Paternal Grandfather, Maternal Grandmother, one of Mother's friends, and the Warren County Children's Services ("WCCS") caseworker who had been assigned to A.L.'s case. At the conclusion of the hearing, the magistrate took the matter under advisement.

{¶6} On August 11, 2020, the magistrate issued a decision that terminated the joint custody agreement, denied Mother's and Father's motions for legal custody, and granted Paternal Grandmother's motion for legal custody of A.L. In doing so, the magistrate noted that the parties' August 28, 2019 Agreed Entry constituted a contractual relinquishment of exclusive custody of A.L. by her parents, thereby forfeiting Mother's and Father's paramount right to custody of the child. Because the parties previously agreed to give Grandmother "joint custody" of A.L., and that agreement was adopted by the court, the magistrate found that the "parental unsuitability [test] d[id] not apply to this case" and that "the only analysis required [was] whether a modification to the prior custody order [was] in the child's best interest."

{¶7} In considering the best interest factors set forth in R.C. 3109.04(F)(1), the magistrate noted that the WCCS caseworker felt it was in A.L.'s best interest for Paternal Grandmother or Father to be awarded legal custody as both had interacted properly with the child and made appropriate decisions for the child. With the exception of overnight visits and trips, A.L. had resided exclusively with Paternal Grandmother for two years, and these years represented the "only stable period of the child's life." A.L. was well adjusted to Paternal Grandmother's home, had significant relationships with her paternal grandparents,

maternal grandparents, and Mother, and was engaged in counseling in Ohio. The magistrate expressed concern about the disruption of these relationships as a result of uprooting A.L. and relocating her to North Carolina to live with Father. The magistrate ultimately concluded it was in A.L.'s best interest for Paternal Grandmother to have legal custody of the child, stating ""[f]or the first time in this child's life she has stability and the Court is not willing to disrupt that stability." Mother and Father were granted parenting time, with Father's parenting time occurring "by agreement of Father and Paternal Grandmother at any time that does not conflict with Mother's parenting time." Father was also given eight consecutive weeks of parenting time during A.L.'s summer break from school and one week of parenting time during A.L.'s winter break.

{¶8} Father objected to the magistrate's decision, arguing that (1) it was against the manifest weight of the evidence not to grant him full legal custody of A.L., (2) the magistrate violated the Military Uniform Services Act in finding him unable to be the residential parent based on his military status, (3) he did not permanently give up his parenting rights when he agreed for Paternal Grandmother to temporarily care for A.L., and (4) the magistrate erred by not permitting him daily phone calls with A.L. when the child was in the care of Paternal Grandmother.

{¶9} On November 18, 2020, the juvenile court issued a decision overruling in part and sustaining in part Father's objections. The juvenile court sustained Father's objections as it related to his ability to have telephone contact with A.L., finding that "Father is entitled to daily phone contact with the minor child as agreed upon by Father and Paternal Grandmother." The court denied Father's remaining objections, finding there was no merit to Father's claim that the magistrate had violated the Military Uniform Services Act and that the denial of legal custody to Father and the award of legal custody to Paternal Grandmother was not against the manifest weight of the evidence. The court further found

that by agreeing to designate Paternal Grandmother as a legal custodian in the Agreed Entry, "Father relinquished his primary right to sole custody, and that act eliminate[d] the need to consider Father's unsuitability for this custody proceeding." The court modified the magistrate's decision to permit daily telephone contact between Father and A.L., but otherwise approved and adopted the magistrate's decision.

{¶10} Father timely appealed, raising the following as his sole assignment of error:

{¶11} THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED AS A MATTER OF LAW BY AWARDING LEGAL CUSTODY OF THE MINOR CHILD, A.L., TO A NON-PARENT RELATIVE.

{¶12} Father argues the juvenile court applied the wrong legal standard in denying his motion for legal custody, contending that rather than a "best interest analysis" the juvenile court was required to apply a "parental suitability analysis." Father asserts that the August 28, 2019 Agreed Entry stating that Paternal Grandmother had "joint custody" and, with Mother, was the "residential and legal custodian" of A.L., did not relinquish his natural parenting rights to Paternal Grandmother as that was not his intention in agreeing to joint custody. He contends that utilizing the "parental suitability analysis," he should have been awarded legal custody as the record "clearly indicates that [his] attributes as a parent can be nowhere near the level necessary to find [him] 'unsuitable.'"

{¶13} R.C. 2151.23(A)(2) grants juvenile courts exclusive original jurisdiction "to determine the custody of any child not a ward of another court of this state." The juvenile court is to exercise its jurisdiction in child-custody matters in accordance with R.C. 3109.04. See R.C. 2151.23(F)(1).

{¶14} Generally, decisions concerning child custody matters rest within the sound discretion of the juvenile court, and "[w]here an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed

as being against the weight of the evidence by a reviewing court." *Bechtol v. Bechtol*, 49 Ohio St.3d 21 (1990), syllabus. *See also In re A.F.*, 12th Dist. Butler No. CA2019-01-005, 2019-Ohio-4627, ¶ 19. The discretion that a juvenile court enjoys in custody matters "'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *In re J.M.*, 12th Dist. Warren No. CA2008-12-148, 2009-Ohio-4824, ¶ 17, quoting *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). However, while "a trial court has broad discretion in determining custody matters, a court has no discretion to apply an improper legal standard in a custody dispute between a parent and a nonparent and, therefore, such 'process flaws' are reviewed on appeal without deference to the trial court." *Anderson v. Anderson*, 12th Dist. Warren No. CA2009-03-033, 2009-Ohio-5636, ¶ 15.

{¶15} "[T]he overriding principle in custody cases between a parent and nonparent is that natural parents have a fundamental liberty interest in the care, custody, and management of their children." *Hockstock v. Hockstock*, 98 Ohio St.3d 238, 2002-Ohio-7208, ¶ 16, citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 (1982) and *In re Murray*, 52 Ohio St.3d 155, 157 (1990). As a result, the Ohio Supreme Court has held that in a custody dispute between a parent and nonparent, a trial court

> may not award custody to the nonparent without first making a finding of parental unsuitability – that is, without first determining that a preponderance of the evidence shows that the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child.

*In re Perales*, 52 Ohio St.2d 89 (1977), syllabus. *See also Masitto v. Masitto*, 22 Ohio St.3d 63, 65 (1986) (noting that in disputes between a parent and a non-parent, parents who are "suitable" persons have a "paramount" right to the custody of their minor children unless they forfeit that right by contract, abandonment, or by becoming totally unable to care for

and support those children).

{¶16} "[I]f a parent contracts away custody rights of his minor child, he may be considered to have forfeited his right to custody of such child, and may accordingly be found to be unsuitable for custody." *Id.*, citing *Perales* at 97. As the supreme court noted, "[p]arents may undoubtedly waive their right to custody of their children and are bound by an agreement to do so." *Id.*, citing *Rowe v. Rowe*, 58 Ohio Law Abs. 497, 499 (2d Dist.1950). Furthermore, while Ohio law does not recognize a parent's attempt to enter into a statutory "shared parenting" arrangement with a nonparent as the nonparent does not fall within the definition of "parent" under the state's current statutes, "a parent may [nonetheless] voluntarily share with a nonparent the care, custody, and control of his or her child through a valid shared-custody agreement." *In re Mullen*, 129 Ohio St.3d 417, 2011-Ohio-3361, ¶ 11, citing *In re Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, ¶ 35, 50. "The essence of such an agreement is the purposeful relinquishment of some portion of the parent's right to exclusive custody of the child." *Id.* "A shared-custody agreement recognizes the general principle that a parent can grant custody rights to a nonparent and will be bound by the agreement." *Id.*, citing *Bonfield* at ¶ 48. *See also Masitto*, 22 Ohio St.3d at 65. "A valid shared-custody agreement is reviewed by the juvenile court and is an enforceable contract subject only to the court's determinations the custodian is 'a proper person to assume the care, training, and education of the child' and that the shared-legal-custody arrangement is in the best interests of the child." *Mullen* at ¶ 11, quoting *Bonfield* at ¶ 48, 50. *See also Masitto* at 65-66.

{¶17} "[T]he determination of whether a 'parent relinquishes rights to custody is a question of fact which, once determined, will be upheld on appeal if there is some reliable credible evidence to support the finding.'" *Mullen* at ¶ 15, quoting *Masitto* at 66. If a parent has contractually relinquished custody of a child to a nonparent, then in a subsequent

custody proceeding between the parent and the nonparent, the general rule is that custody will not be modified unless "necessary to serve the best interest of the child." *Masitto* at 65, citing R.C. 3109.04(B). *See also Redmond v. Davis*, 7th Dist. Columbiana No. 14 CO 37, 2015-Ohio-1198, ¶ 39. "When an original custody award has already been made, the subsequent contest does not require application of the suitability test." *Id.* at ¶ 48.

{¶18} In *Masitto*, the supreme court found that a father's consent to the probate court's appointment of his child's maternal grandparents as guardians for the child and the incorporation of this guardianship order in a decree of divorce in domestic relations court constituted a contractual relinquishment of the father's paramount right to custody of his daughter. The court found that the parental unsuitability test was not the proper standard when the father sought a change in custody, stating, "Under all the facts here, we hold that by consenting to the guardianship and divorce decree, the father forfeited his natural rights of custody of his daughter, *making the child's best interest the appropriate test for a change of custody."* (Emphasis added.) *Masitto* at 66.

{¶19} Similarly, in *Redmond*, 2015-Ohio-1198, the Seventh District Court of Appeals found that an agreed order for shared custody between a parent and a nonparent was sufficient to contractually relinquish the parent's paramount right to custody. *Id.* at ¶ 50. There, a mother entered into a shared-parenting arrangement with her boyfriend, who was not her child's biological father, and the agreement was adopted by the juvenile court. The court found that "[w]here there is a prior order granting shared custody to a non-parent by incorporating that agreement, the parent does not have a paramount right to custody. *A finding of parental unsuitability is not required in order to refuse the parent's later request for sole custody.*" (Emphasis added.) *Id.* at ¶ 51.

{¶20} The present case is similar to *Masitto* and *Redmond* in that Father contractually relinquished exclusive custody of A.L. by entering into a shared custody, or

"joint-custody," agreement. The Agreed Entry, which was adopted by the juvenile court, specifically designated Paternal Grandmother, along with Mother, as a "residential and legal custodian" of A.L. Though Father contends the joint custody arrangement was not intended to be permanent but rather was meant to address the "immediate situation" caused by Mother's drug use and homelessness coupled with his location in North Carolina for military service, there is nothing in the Agreed Entry suggesting that the arrangement was temporary or had anything to do with Father's circumstances of being in the Marines and stationed in North Carolina. The Agreed Entry did not provide Paternal Grandmother with temporary custody, but rather gave her legal custody of A.L.[1]

{¶21} As we previously recognized, whether a parent has relinquished his or her right to custody is a "question of fact which, once determined, will be upheld on appeal if there is some reliable, credible evidence to support the finding." *Masitto*, 22 Ohio St.3d at 66. Here, there is reliable, credible evidence to support the juvenile court's finding that the Agreed Entry was a relinquishment of Father's paramount right to custody. Therefore, the juvenile court did not err in resolving the parties' competing motions for legal custody of the child utilizing a best interest analysis.

---

1. Compare the facts in the present case to those in *Hockstock v. Hockstock*, 98 Ohio St.3d 238, 2002-Ohio-7208, wherein a mother agreed to an award of temporary custody of her child to the child's maternal grandparents. There, the agreement specifically stated that maternal grandparents were being awarded "temporary legal care and custody" of the child "for a period of six (6) months" while the mother took steps to create a more stable living environment for the child. *Id.* at ¶ 4. When the six months expired, the parties entered into another agreement continuing the same terms and conditions as the original. *Id.* at ¶ 6. Mother then took steps to regain custody of her child and opposed the maternal grandparents' motion for legal custody. *Id.* at ¶ 7-11. The case made its way before the Ohio Supreme Court, which held that a finding of parental unsuitability was required as

> there is no evidence that [mother] ever agreed to give the [maternal grandparents] legal custody of her child. [Mother] merely entered into an agreement whereby the [maternal grandparents] were given temporary custody of the child, and it is undisputed in the record that this temporary custody was not a grant of legal custody. The record is also undisputed that [mother] resisted all efforts by the [maternal grandparents] to gain legal custody of the child * * *.

*Id.* at ¶ 33.

{¶22} We further find that the juvenile court did not abuse its discretion in awarding legal custody of A.L. to Paternal Grandmother following its consideration of the best interest factors set forth in R.C. 3109.04(F)(1). The best interest factors include, but are not limited to, (1) the wishes of the child's parents, (2) the child's wishes, as expressed to the court in chambers, (3) the child's interactions and interrelationships with parents, siblings, and other persons who may significantly affect the child's best interests, and (4) the child's adjustment to home, school, and community, (5) the mental and physical health of all persons involved in the situation, (6) the parent more likely to honor and facilitate visitation, (7) whether one parent has denied the other of parenting time, (8) whether child support orders have been followed, and (9) whether either parent has established or is planning to establish a residence outside of Ohio. R.C. 3109.04(F)(1)(a)-(j).

{¶23} As the juvenile court and magistrate noted, A.L. is loved by many people and she is bonded to Mother, Father, Paternal Grandmother and to her extended family on both her maternal and paternal sides. Though Mother has not created a stable environment for A.L., as evidenced by the fact that she has moved numerous times since 2018, failed to hold a steady job, and has not completed case plan objectives set forth by WCCS, the record nonetheless discloses that A.L. has a close connection to her Mother. Mother has exercised her supervised parenting time with the child and the child enjoys spending time with Mother.

{¶24} A.L. is also bonded with Father. Though Father joined the Marines in July 2016 and has been stationed in North Carolina for a number of years, Father has maintained constant contact with A.L. Father has daily phone and video calls with A.L. and he makes at least two trips to Ohio per year to spend his leave time with A.L. Additionally, Father spends time with A.L. when his parents take A.L. to North Carolina to visit with Father and Father's family. A.L. has spent as many as ten consecutive days visiting Father in

North Carolina. A.L. enjoys spending time with her stepmother, stepsister, who is a grade-level ahead of her, and with her half-sister.

{¶25} A.L. also has a close connection to Paternal Grandmother and, as the juvenile court noted, Paternal Grandmother has provided a stable home for A.L. In fact, Paternal Grandmother has provided "the most, and only, stable period of the child's life." While in Paternal Grandmother's care, A.L. has been afforded the opportunity to see her extended family members. Paternal Grandfather, who is divorced from Paternal Grandmother, plays an active role in A.L.'s life. In addition to spending time with A.L. two to three times a week and taking A.L. to her various extracurricular activities, Paternal Grandfather frequently supervises Mother's visitations with the child.

{¶26} By all accounts, A.L. is doing well in Paternal Grandmother's care. She attended a preschool in Mason, Ohio and is set to be enrolled in a private Catholic school for kindergarten. A.L. has taken swim lessons and is involved in gymnastics and dance. She attends regular doctor and dentist appointments. She is also enrolled in counseling and has been since the fall of 2019, when she disclosed that one of Mother's boyfriends sexually molested her. Following the event with Mother's boyfriend, A.L.'s behavior changed; she started having trouble with boundaries and having attachment issues with men. A.L. was seeing her counselor weekly, but the frequency of her visits slowed down due to the coronavirus pandemic. As the juvenile court noted, there are "significant concerns for the mental health of the child," given that she has had "to deal with Mother's mental health issues, a lack of stability in housing, the fallout of Mother's interrelationship problems, and now is the victim of sexual abuse."

{¶27} The fact that the parties reside in separate states was also a relevant factor the juvenile court considered. The record indicates Father will continue to reside in North Carolina for at least the next year and a half as he recently reenlisted in the Marines for

- 11 -

another two years. The remainder of A.L.'s family members reside in Ohio, with Paternal Grandmother living in Oregonia, Mother living in Cincinnati, and maternal grandparents residing in Loveland. While the juvenile court had "no concerns that either Father or Paternal Grandmother would follow court orders" regarding parenting time, the court was nonetheless concerned about the effect that a move to North Carolina would have on A.L. The court noted that "the past two (2) years in Paternal Grandmother's home has been the most, and only, stable period of the child's life. Moving the child would disrupt clear bonds between the child and multiple people, including specifically Mother, Paternal Grandmother, Paternal Grandfather, and Maternal Grandmother." Though Father would support A.L.'s continued contact with these family members, A.L.'s interactions with her family members would be disrupted, their bonds interfered with, and the child's sense of normalcy impacted. Additionally, as the juvenile court noted, "although counseling services would be available to the child in North Carolina, a move would result in the disruption of the present counseling services" and would therefore have an effect on A.L.'s mental health.

{¶28} Finally, the juvenile court considered Father's claim that Paternal Grandmother caring for A.L. was only meant to be temporary. Though Paternal Grandmother and Father indicated Paternal Grandmother only took a "front seat role" in caring for A.L. because of the emergency created by Mother's homelessness and abuse of drugs while Father was out of state due to his enlistment in the Marines, the court noted that the Agreed Entry awarded Paternal Grandmother legal custody of A.L., not temporary custody. Nothing had changed in Father's circumstances between the time he entered into the Agreed Entry and the time he moved for custody – he was still living out of state and was enlisted in the military.

{¶29} Given the record before us, we find that the juvenile court did not abuse its discretion in denying Father's motion for legal custody. The court's determination that it

was in A.L.'s best interest for Paternal Grandmother to have legal custody of the child is supported by a substantial amount of competent and credible evidence. Father's sole assignment of error is, therefore, overruled.

{¶30} Judgment affirmed.

M. POWELL, P.J., and S. POWELL, J., concur.