**[Cite as *In re L.C.*, 2020-Ohio-4629.]**

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| L.C. | : | CASE NO. CA2019-08-086 |
| | : | <u>O P I N I O N</u><br>9/28/2020 |
| | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 17-D000192

Craig A. Newburger, 477 Forest Edge Drive, South Lebanon, Ohio 45065, for appellant

Mark W. Raines, 246 High Street, Hamilton, Ohio 45011, for appellee, B.H.

David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for appellee, Warren County Children Services

Ostrowski Law Firm Co., L.P.A., Andrea G. Ostrowski, 20 South Main Street, Springboro, Ohio 45066, for CASA

Brooke Logsdon, 223 North Broadway Street, Lebanon, Ohio 45036, for mother

**HENDRICKSON, P.J.**

{¶1} Appellant, H.C. ("Father"), appeals the decision of the Warren County Court of Common Pleas, Juvenile Division, granting legal custody of his minor son, L.C., to appellee, B.H., the child's maternal grandmother ("Maternal Grandmother"). For the

reasons that follow, we affirm the juvenile court's decision.

{¶2} L.C. was born on May 14, 2015 to Father and S.H. ("Mother"), who were not married. Mother, who has abused marijuana, methamphetamine, heroin, and cocaine, met Father around 2011 when she purchased drugs from him. The two entered into a relationship that lasted approximately four years. During their relationship, Mother and Father used drugs and Father continued to sell drugs until 2015.

{¶3} In 2014, Mother became pregnant with L.C. At this time, Father was residing in a hotel in Akron. Mother briefly lived with Father in Akron, but moved to Franklin to be closer to Maternal Grandmother. When L.C. was born in May 2015, Father briefly visited the child, but he did not sign L.C.'s birth certificate.

{¶4} Father moved to Franklin in August 2016 upon Maternal Grandmother's request that Father help care for L.C. while Mother entered a drug rehabilitation program. Father lived with Mother and L.C. at Maternal Grandmother's residence for a period of time before he, Mother, and L.C. moved into an apartment. Mother and Father ended their relationship shortly thereafter and Father moved into a hotel. Father left L.C. in Mother's care, despite knowing Mother had a drug abuse problem and was continuing to use drugs. Father provided financial support for L.C. following his breakup with Mother. Once a week, Mother visited Father at his place of employment, a gentleman's club, and Father would give Mother cash.

{¶5} On November 7, 2017, Warren County Children Services (WCCS) filed a complaint with the juvenile court alleging that L.C. was a dependent child based on Mother's drug use. L.C. was placed in the temporary custody of Maternal Grandmother, and Father was ordered to take a DNA test to establish his paternity of L.C. On December 27, 2017, the juvenile court adjudicated L.C. a dependent child and ordered that temporary custody of L.C. remain with Maternal Grandmother, with protective supervision given to WCCS.

Father was granted supervised parenting time with L.C., and both Father and Mother were put on a case plan with the goal of reunification with the child. In April 2018, Mother was removed from the case plan for non-compliance. Father's girlfriend, with whom he lived with in Hamilton, was put on the case plan in June 2018.

{¶6} Father made progress on his case plan, but his visitation with L.C. was sporadic. On October 23, 2018, Maternal Grandmother filed a motion for legal custody of L.C. Shortly thereafter, on November 5, 2018, Father filed a motion for legal custody, or, in the alternative, for a six-month extension. A hearing on the competing motions was held before a magistrate on May 2, 2019. By this time, Father had completed his case plan services and his visitation with L.C. had become more regular and frequent. At the hearing, the magistrate heard testimony from Father, Father's girlfriend, Maternal Grandmother, Mother, and a WCCS caseworker who had been involved in L.C.'s case since December 2017.

{¶7} On May 17, 2019, the magistrate issued a decision denying Father's motion for legal custody or, in the alternative, a six-month extension, granting Maternal Grandmother's motion for legal custody, and awarding Father parenting time pursuant to the court's model parenting schedule. The magistrate concluded it was in L.C.'s best interest to be placed in Maternal Grandmother's legal custody as "Maternal Grandmother has shown that she is able to provide [L.C.] the stability that he needs; whereas Father has not." The magistrate noted that Maternal Grandmother had rearranged her life in order to properly care for L.C. Father, on the other hand, had "simply never made [L.C.] a priority when [L.C.] should have been the only thing that mattered all along." The magistrate noted that Father had exercised poor decision making with respect to L.C.'s care, "choos[ing] to leave [L.C.] in the care of his drug addicted Mother to go off and live his own life" and giving Mother, a known drug addict, substantial amounts of cash each week after leaving L.C. in

her care. Additionally, until Maternal Grandmother filed her motion for legal custody, Father only had sporadic visitation with the child, even though he had the opportunity for unlimited contact with L.C. since the start of the case. Father also failed to take the necessary steps to obtain his driver's license so that he could provide transportation for L.C.

{¶8} Father filed timely objections to the magistrate's decision, arguing the magistrate erred in denying his motion for legal custody and granting Maternal Grandmother legal custody of L.C. where the evidence presented at the hearing demonstrated he had completed his case plan services, maintained steady employment and housing, had not tested positive for an illegal substance in more than a year, and had been having extended and successful parenting time with L.C. Father contended that these facts, combined with the fact that Maternal Grandmother had significant health issues, demonstrated that it was in L.C.'s best interest for Father to be granted legal custody of the child. On August 6, 2019, the juvenile court overruled Father's objections and adopted the magistrate's decision.

{¶9} Father appealed the juvenile court's decision, raising the following as his only assignment of error:

{¶10} THE TRIAL COURT'S FINDING THAT A GRANT OF LEGAL CUSTODY TO MINOR'S MATERNAL GRANDMOTHER IS IN L.C.'S BEST INTEREST, AND FAILING TO GRANT FATHER'S MOTION FOR CUSTODY OR IN THE ALTERNATIVE GRANT A SIX MONTH EXTENSION SO THAT FATHER COULD SUCCESSFULLY REUNITE WITH HIS SON, WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶11} Father argues the juvenile court's decision to grant Maternal Grandmother legal custody of L.C. was against the manifest weight of the evidence. Citing R.C. 2151.414(B)(1), Father contends the juvenile court's best interest finding was not supported by clear and convincing evidence. Father fails, however, to offer any explanation, analysis,

or citation to the record to support his assertion that granting Maternal Grandmother legal custody was not in L.C.'s best interest and was against the manifest weight of the evidence.

{¶12} App.R. 16 provides that an appellant's brief "shall include * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." App.R. 16(A)(7). App.R. 12 provides an appellate court with the discretion to "disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)." App.R. 12(A)(2). Although this court is entitled to disregard Father's assigned error due to his noncompliance with App.R. 16(A)(7); *see In re C.S.*, 12th Dist. Butler Nos. CA2005-06-152 and CA2005-06-153, 2006-Ohio-5198, ¶ 19-21; we find it appropriate, in this instance, to address his arguments.

{¶13} As an initial matter, we note that the statute cited by Father, R.C. 2151.414(B)(1), is inapplicable as that statute governs the award of *permanent custody*, not legal custody. Legal custody is not as drastic of a remedy as permanent custody because it "does not divest parents of their residual parental rights, privileges, and responsibilities." *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, ¶ 17. Unlike permanent custody, granting legal custody does not terminate the parent-child relationship, and a parent retains the ability to petition the court for a modification of custody at a later date. *In re A.B.*, Brown No. CA2016-11-021, 2017-Ohio-5776, ¶ 10; *In re C.R.* at ¶ 17.

{¶14} "Pursuant to R.C. 2151.353(A)(3), if a child is adjudicated an abused, neglected, or dependent child, the juvenile court may award legal custody of the child 'to either parent or to any person who, prior to the dispositional hearing, files a motion requesting legal custody of the child[.]'" *In re A.B.* at ¶ 10. Legal custody may be awarded

to a nonparent "upon a demonstration by a preponderance of the evidence that granting legal custody to the nonparent is in the child's best interest." *In re C.A.*, 12th Dist. Butler No. CA2014-07-165, 2015-Ohio-1410, ¶ 13. *See also In re L.T.*, 12th Dist. Butler Nos. CA2016-03-048 and CA2016-03-058, ¶ 60 ("A juvenile court must base its custody determination under R.C. 2151.353 on the best interest of the child").

{¶15} To determine the best interest of a child, the juvenile court is required to consider all relevant factors, including applicable factors set forth in R.C. 3109.04(F). *In re A.B.* at ¶ 11. These factors include, but are not limited to: (1) the wishes of the child's parents regarding the child's care; (2) the wishes and concerns of the child, as expressed to the juvenile court, (3) the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (4) the child's adjustment to the child's home, school, and community; (5) the mental and physical health of all persons involved; and (6) the parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights. R.C. 3109.04(F)(1)(a) thru (f).

{¶16} When reviewing custody issues, a juvenile court's decision is granted great deference and will not be disturbed on appeal absent an abuse of discretion. *In re A.C.C.*, 12th Dist. Warren No. CA2018-03-028, 2018-Ohio-4719, ¶ 40. An abuse of discretion implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *Id.* When applying an abuse-of-discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court. *Id.* The discretion afforded to a juvenile court in custody matters "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). A deferential review in a child custody case is appropriate because much may be evident in the parties' demeanor and attitude that does

not translate well to the record. *Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997). Furthermore, "[w]here an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court." *In re T.M.*, 12th Dist. Butler No. CA2007-01-019, 2007-Ohio-6034, ¶ 28, citing *Flickinger* at 418.

{¶17} After reviewing the transcripts and exhibits admitted into evidence at the May 2, 2019 hearing, we find that the juvenile court did not abuse its discretion in denying Father's motion for legal custody and granting legal custody of L.C. to Maternal Grandmother. The record reveals that L.C., who was four years old at the time the court issued its decision, has been in Maternal Grandmother's care since November 2017, when he was approximately two-and-one-half years old. By all accounts, L.C. has done very well in Maternal Grandmother's care and is thriving. L.C. is very bonded to Maternal Grandmother and the two enjoy gardening together, working on flashcards, feeding the neighbor's chickens, and attending church together.

{¶18} The record demonstrates that Maternal Grandmother puts L.C.'s best interests first. She enrolled him in a Head Start school program and, when it became apparent that his speech was not progressing as it should, engaged a speech therapist to improve L.C.'s communication skills. Maternal Grandmother volunteers in L.C.'s classroom and is the vice-president of the school board. In addition to Maternal Grandmother's active involvement in L.C.'s education, Maternal Grandmother also made sure L.C. was engaged in his community and that he had the opportunity for socialization with his peers. Maternal Grandmother takes L.C. to an interactive reading program at the library and to Sunday school at their church.

{¶19} As L.C.'s caseworker testified, WCCS has no concerns about L.C. being in Maternal Grandmother's custody. Maternal Grandmother is able to financially care for L.C.,

as she receives social security benefits, her husband is employed fulltime, and they live in a house owned by her husband. Although Grandmother has a criminal record consisting of convictions for passing a bad check in the early 1990s, assault in 2002, and two OVI offenses from 2003 and 2005, all of these offenses occurred more than a decade before L.C.'s birth. Maternal Grandmother had straightened out her life. She had no positive drug screenings during the pendency of the case and WCCS does not have any mental health, drug, or alcohol concerns as it relates to Maternal Grandmother.

{¶20} At the time L.C. was placed in her care, Maternal Grandmother had been without her driver's license for ten years. Within a few months of being granted temporary custody, she obtained her license. She then saved for seven months to purchase a car to ensure that she could transport L.C. to school, medical appointments, and anywhere else he may need to go. Maternal Grandmother used her license and new vehicle to transport L.C. to Father's home for visitations when Father could not provide transportation due to his lack of a license. Maternal Grandmother testified that she would continue to facilitate a relationship between L.C. and Father and would abide by any visitation orders imposed by the juvenile court as it related to Father's or Mother's parenting time.

{¶21} Although 59 years old with some underlying health conditions, Maternal Grandmother has the energy to keep up with L.C. In 2008, Maternal Grandmother had Graves disease, which ultimately caused her to lose her vision in one eye and necessitated the removal of her thyroid. However, her condition stabilized after the surgery and she has been able to control all of her underlying health issues, including diabetes, since then. Maternal Grandmother's health issues have not prevented her from obtaining her driver's license, participating in L.C.'s school and church activities, or caring for L.C.

{¶22} L.C.'s caseworker testified that WCCS completed a background check and home study on Maternal Grandmother and the agency had no concerns about her ability to

provide a safe, stable home for L.C. Regarding Father's concerns about a mouse trap on the kitchen floor of Maternal Grandmother's home, Maternal Grandmother explained that the mousetrap was in an area where L.C. does not play and she had educated L.C. on the trap's potential for harm. As for knives that Father was concerned Maternal Grandmother left sitting out, Maternal Grandmother explained the knives were sitting on a cutting board that she was using while cooking. Finally, while Maternal Grandmother allowed Mother to stay two nights in her home after a car accident, Maternal Grandmother had Mother immediately leave when advised by WCCS that Mother could not reside in the same home as L.C. Maternal Grandmother testified she has, and will, continue to abide by court orders as it relates to Mother's ability to see and interact with L.C. and would prevent Mother from interacting with L.C. if Mother was intoxicated or under the influence of drugs.

{¶23} L.C.'s caseworker recommended that Maternal Grandmother and Father have shared parenting. However, the caseworker testified that if shared parenting was not going to be ordered by the court, the caseworker felt Maternal Grandmother should be named legal custodian as Maternal Grandmother had been consistent in caring for L.C. The caseworker noted that while Father had completed the case plan and taken many positive strides in establishing a relationship with L.C., including increasing his visitation with L.C. and maintaining stable housing and employment, Father had not been a constant presence in L.C.'s life. The amount of time it took for Father to progress on his case plan demonstrated L.C. was not always a priority in Father's life and it allowed L.C. to become established in Maternal Grandmother's home.

{¶24} The record reflects that Father has a troubled past and has not always acted in L.C.'s best interests. Father has been convicted of trafficking in drugs, attempted possession of cocaine, and theft. Father was aware of Mother's drug addiction, as he sold her drugs and used drugs with her. Father knew Mother was continuing to abuse drugs

after L.C.'s birth, but he left L.C. in Mother's care after ending his romantic relationship with Mother. Father then provided Mother, a known drug user, with large sums of cash on a weekly basis. Father continued to use drugs after ending his relationship with Mother. He tested positive for marijuana on multiple occasions, with his last positive drug test occurring on February 8, 2018.

{¶25} The record further reflects that Father has not been as active in L.C.'s life as he could have been. When the case was initiated, Father was permitted unlimited supervised visitation with L.C. Despite this, Father's visitation was infrequent and sporadic. From November 2017 through January 2018, Father only visited L.C. one time. Between January and April of 2018, Father only visited L.C. three times. He had one 15-minute visit in May 2018, did not visit with L.C. at all in June 2018, and had sporadic visitation in July and August 2018. Father's visitation began to improve around September 2018. After Maternal Grandmother filed her motion for legal custody of L.C., Father's visitation become more frequent and regular, and in February 2019, Father was approved for home visits. The visitations went well and in April 2019, Father was approved for overnight visitations with L.C.

{¶26} Part of the delay in Father being approved for home and overnight visitations was caused by Father's girlfriend's failure to timely obtain a background check. Father resides in a home with his girlfriend, her 15-year-old son, and her 8-year-old daughter. Father's girlfriend, who is a part-time police officer, was added to the case plan in June 2018. She was informed then that she was required to have a background check. Despite this, Father and his girlfriend waited until January 2019 to have the girlfriend's background check completed.

{¶27} As the juvenile court noted, Father's lack of transportation is problematic. Like Maternal Grandmother, Father has not had a license for a number of years. Father

indicated he looked into what it would take to get his license reinstated and was advised that he would need to pay off certain fees. Father has not paid the fees and instead relies on his girlfriend or others to transport him to his visitations with L.C. or anywhere else he needs to go. Father's girlfriend, however, does not have her own vehicle and instead relies on her ability to borrow her mother's vehicle in order to have transportation. L.C.'s caseworker testified it was concerning to WCCS that Father did not have a license or reliable transportation, as Father could not be depended on to transport L.C. to his medical appointments or other activities.

{¶28} In addition to failing to prioritize obtaining his license and exercising visitation with his son, the record reflects that Father has failed to take an active role in L.C.'s schooling. Despite acknowledging that Maternal Grandmother has kept him informed of L.C.'s school events, Father has not attended any school functions and could not be counted on to complete or return work sent with L.C. on visitations. Furthermore, although Father indicated he would enroll L.C. in a school near his home in Hamilton, Father had not visited any schools or daycares to secure enrollment.

{¶29} Accordingly, given the record before us, we find that the juvenile court did not abuse its discretion in denying Father's motion for legal custody and granting Maternal Grandmother's motion for legal custody as the court's decision was supported by the manifest weight of the evidence. The juvenile court properly considered all relevant factors, including those set forth in R.C. 3109.04(F), in determining that it was in L.C.'s best interest to award Maternal Grandmother legal custody. Father's sole assignment of error is, therefore, overruled.

{¶30} Judgment affirmed.

S. POWELL and PIPER, JJ., concur.