[Cite as *In re A.M.W.*, 2022-Ohio-2913.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

IN RE: : 

A.M.W. : CASE NO. CA2021-12-159

: O P I N I O N
8/22/2022

:

:

:


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2019-0325


Mark W. Raines, for appellant, R.W.

Michael T. Gmoser, Butler County Prosecuting Attorney, and John C. Heinkel, Assistant Prosecuting Attorney, for appellee, Butler County Children Services.

Harrison Legal Services, and Brian K. Harrison, for appellees, A.K. and C.K.

Amy R. Ashcraft, for CASA.

Marcelina Woods, guardian ad litem.


**PIPER, J.**

{¶ 1} Appellant is the biological father ("Father") of A.W. who appeals the decision

of the Butler County Court of Common Pleas, Juvenile Division, granting legal custody of

his son to foster parents. The child's biological mother ("Mother") did not appeal. For the reasons detailed below, we affirm.

{¶ 2} On July 29, 2019, the Butler County Department of Job and Family Services ("BCDJFS") filed a complaint alleging A.W. was an abused and dependent child. Among other things, the complaint alleged that Mother and A.W. both tested positive for cocaine at the time of A.W.'s birth. Mother later admitted to using cocaine during her pregnancy. The complaint also stated that Mother had two open cases with the agency and those children were placed with a relative.[1] At the time, the identity of A.W.'s father was unknown.

{¶ 3} BCDJFS was granted ex parte temporary custody of A.W. and he was immediately placed in the care of his foster parents, where he has remained since his discharge from the hospital. A.W. was subsequently adjudicated an abused child and the agency was granted temporary custody. On May 8, 2020, BCDJFS filed a motion for permanent custody of A.W.

{¶ 4} During the pendency of this case, Mother struggled to maintain her sobriety and failed to participate in any services. As relevant to this case, Mother testified that she lied to Father and told him that A.W. was not his son.

{¶ 5} In April 2020, Father testified that his niece and his sister told him that Mother had a child, A.W., and that the child looked like him. Father understood it was a possibility that the child was his because he had been sexually active with Mother. However, Father did not immediately contact the agency.

{¶ 6} On August 7, 2020, Father filed a financial disclosure form to obtain appointed counsel, which was subsequently approved. Father was confirmed to be the biological parent of A.W. in October 2020 following paternity testing. On January 12, 2021, the

---

1. At a later hearing, Mother testified that her two older children were placed in the permanent custody of the agency. Mother had another child after A.W. who was later placed in the legal custody of another individual.

juvenile court ratified the results of the testing and found Father to be A.W.'s parent. Father was then included in the case plan.

{¶ 7} On January 28, 2021, Mother's aunt and uncle moved to intervene and filed a motion for legal custody of A.W. Prior to the final hearing, Mother's aunt and uncle withdrew their motion for custody and supported the foster parents' motion for legal custody. Because they ultimately dismissed their motion for legal custody and supported the foster parents, we need not discuss their limited involvement in much detail.

{¶ 8} On March 3, 2021, the foster parents also filed motions to intervene and for legal custody of A.W. The pending motions for legal custody were heard on July 12, August 10, and November 18, 2021.[2] Although Father did not file a motion for custody, he asked that custody be granted in his favor during the final hearing.

{¶ 9} During the hearings, a caseworker from BCDJFS testified that A.W. was doing great in his continued placement with his foster parents. The caseworker testified that A.W.'s needs are being met, including his specialized needs as a result of having been exposed to cocaine in utero. The caseworker described A.W. as happy and bonded with his foster family. The caseworker further testified that it was in A.W.'s best interests to have his foster parents awarded legal custody and noted that he had continuously lived with them since he was four days old and is therefore bonded with them as his caregivers.

{¶ 10} During his testimony Father admitted that he only had supervised visits with A.W. three or four times. Father also admitted at the November 8, 2021 hearing that he had not visited A.W. the entire year of 2021. Despite the very limited interactions with A.W., Father requested custody of A.W. at the final hearing. Throughout his testimony Father stated that he had raised two grown children, had income in the form of social security

---

2. Although the state initially moved for permanent custody, the record shows that the state did not prosecute that matter and therefore the only pending issues for the court involved the granting of legal custody.

disability payments, and had all the necessary items and supplies to take A.W. home that day. In essence, Father argued and testified that he was never given the opportunity to parent or establish a relationship with A.W. and therefore custody should be given to him rather than to the foster parents. As relevant to that point, the record reveals that Father had issues maintaining his sobriety. In January 2021, visitations with A.W. were conditionally suspended until Father could pass three consecutive drug screens.[3] Father did not provide the necessary clean drug screens until October 2021. Shortly thereafter, the juvenile court held its final hearing on the pending motions.

{¶ 11} The foster parents testified at length about A.W., as he has been in their continuous care since he was discharged from the hospital. The foster parents testified about A.W.'s medical needs, their unconditional love for him, as well as his relationships with their family members. There was also evidence that the foster parents have gone to great lengths to develop bonds with A.W.'s biological siblings and extended family.

{¶ 12} On November 12, 2021, the magistrate issued a written decision addressing each of the requisite best interest factors and found it was in A.W.'s best interest that he be placed in the legal custody of his foster parents. Father filed objections to the magistrate's decision, which the juvenile court overruled. Father timely appeals, raising two assignments of error for review.

{¶ 13} Assignment of Error No. 1:

{¶ 14} THE TRIAL COURT ERRED WHEN AWARDED [sic] LEGAL CUSTODY TO THE [FOSTER PARENTS].

{¶ 15} Father argues the juvenile court erred by awarding legal custody of A.W. to his foster parents. Father asserts that a court is required to analyze and apply the best

---

[3]. Father cancelled his last visit with A.W. scheduled for December 29, 2020.

interest factors in R.C. 3109.04(F) before granting custody of a minor child to a party. Yet, review of the record reveals that the juvenile court did conduct a thorough analysis of those factors in granting legal custody to the foster parents. Therefore, Father's argument is more appropriately characterized as a challenge to the juvenile court's weighing of the evidence, including its consideration of the best interest factors.

{¶ 16} Unlike a grant of permanent custody, an award of legal custody does not terminate the parent-child relationship. *In re L.C.*, 12th Dist. Warren No. CA2019-08-086, 2020-Ohio-4629, ¶ 13; *In re Fulton*, 12th Dist. Butler No. CA2002-09-236, 2003-Ohio-5984, ¶ 7 ("granting legal custody does not terminate the parent-child relationship"). Rather, an award of legal custody merely vests in the custodian the physical care and control of the child while the residual parental rights and responsibilities remain intact with the child's parent(s). *In re A.B.*, 12th Dist. Brown No. CA2016-11-021, 2017-Ohio-5776, ¶ 10. This includes, for instance, "contact and visitation rights and a duty of support." *In re M.M.*, 12th Dist. Fayette No. CA2010-12-034, 2011-Ohio-3913, ¶ 7. This also includes the ability to petition the juvenile court for a custody modification in the future. *In re T.B.*, 5th Dist. Muskingum No. CT2018-0065, 2019-Ohio-1747, ¶ 21. An award of legal custody, therefore, is not as drastic a remedy as a grant of permanent custody because such an award "does not divest parents of their residual parental rights, privileges, and responsibilities." *In re K.G.*, 12th Dist. Clinton No. CA2020-11-017, 2021-Ohio-2154, ¶ 17, citing *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, ¶ 17.

{¶ 17} R.C. 2151.353(A)(3) provides that if a child has been adjudicated abused, dependent, or neglected, a juvenile court may award legal custody of the child "to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child." After a child has been adjudicated abused, neglected, or dependent, such as the case here, a juvenile court "may award legal custody

to a nonparent upon a demonstration by a preponderance of the evidence that granting legal custody to the nonparent is in the child's best interest." *In re C.L.T.*, 12th Dist. Butler No. CA2011-04-073, 2012-Ohio-427, ¶ 10. "A preponderance of the evidence is evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it." *Id.*

{¶ 18} A juvenile court's custody determination under R.C. 2151.353 must be based on the best interests of the child. *In re K.B.*, 12th Dist. Butler No. CA2012-03-063, 2013-Ohio-858, ¶ 11. In determining the best interests of the child, the juvenile court must consider all relevant factors, including, but not limited to, the applicable factors set forth in R.C. 3109.04(F). *Id.*

{¶ 19} This court reviews the juvenile court's custody determination for an abuse of discretion. *In re S.K.*, 12th Dist. Butler No. CA2013-06-108, 2014-Ohio-563, ¶ 12. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). The discretion that a juvenile court enjoys in custody matters "'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *In re J.M.*, 12th Dist. Warren No. CA2008-12-148, 2009-Ohio-4824, ¶ 17, quoting *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988).

{¶ 20} Moreover, a challenge to the manifest weight of the evidence involves the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12. In a manifest weight challenge "the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered."

*In re A.F.*, 12th Dist. Butler No. CA2019-01-005, 2019-Ohio-4627, ¶ 20.

{¶ 21} On appeal, Father argues the juvenile court failed to appropriately consider and balance the evidence in this case prior to awarding legal custody of A.W. to his foster parents. According to Father, BCDJFS and the GAL never viewed him as a "true option" for custody of A.W. He further maintains that he has raised two grown children of his own and, although he is disabled, there was no evidence that his mental or physical health would prevent him from raising A.W. He maintains that the best interest factors should be reweighed and emphasizes that many of the factors not in his favor are the result of the agency's failures to allow him to build a relationship with A.W.

{¶ 22} However, while Father may weigh the best factors differently, we find the juvenile court's decision finding it was in A.W.'s best interest to grant legal custody to his foster parents was not an abuse of discretion. A.W., who was two-and-one-half years old at the time of the last hearing, had been in the continuous and exclusive custody of his foster parents since he was discharged from the hospital when he was four days old. As noted above, the record reflects that the juvenile court thoroughly and completely considered the best interest factors in R.C. 3109.04(F).

{¶ 23} The juvenile court considered the wishes of Mother, who was not opposed to A.W. remaining in the care of the foster parents. The juvenile court noted that Father wanted A.W. to be placed with him immediately. Considering A.W.'s tender age, the juvenile court did not interview him, but the juvenile court found A.W.'s wishes were best presented through the GAL who recommended that the foster parents be granted legal custody.

{¶ 24} The juvenile court considered A.W.'s best interests in light of his interactions and interrelationships. The juvenile court found that neither Mother nor Father had any practical relationship with A.W. Father had no relationship with A.W. until paternity testing

and was slow or unwilling to abide by the conditions necessary to continue visitation with the child. When Father tested positive for drugs, he needed three consecutive clean drug screens to visit A.W. It took Father approximately 10 months to do so. As to the foster parents, the court found that they have been A.W.'s de facto parents all of his life. They are committed to meeting his best interests and have incorporated him into their family. They have also taken the initiative to establish bonds between A.W. and other members of his biological family.

{¶ 25} The juvenile court found that A.W. is well adjusted in his home with the foster family. The juvenile court went on to discuss Father's mental and physical health, including the fact that he was less than forthcoming about his health conditions. The juvenile court then discussed Father's substance abuse and that he ceased participation in his case plan services.

{¶ 26} As to who was more likely to honor and facilitate parenting time or other visitation rights, the juvenile court found no evidence that Father would honor visitation orders. Meanwhile, the foster parents only stipulated that they wanted to make sure the visits were "safe." Although the juvenile court noted that BCDJFS could have been more helpful to Father or offered him more encouragement, the juvenile court ultimately concluded that it was Father's own actions and inactions that left him in the current situation.

{¶ 27} In further argument on appeal, Father alleges the GAL failed to satisfy her responsibilities under Sup.R. 48 because she failed to adequately investigate the case. Specifically, he claims that the GAL had little information about his housing situation, criminal record, income source, and "failed to make any effort looking into a specific party seeking custody." However, the GAL correctly notes that when the trial started, Father had

not filed a motion for custody.[4]  In fact, Father never filed a motion for custody but requested that custody be granted to him during his testimony, which occurred at the final hearing date.  When the GAL testified, the court had only two pending motions for legal custody involving the mother's aunt and uncle and the foster parents.  During her testimony, the GAL testified about her interactions with A.W., the foster parents, and mother's aunt and uncle.  Since she also served as the GAL for A.W.'s older siblings, she was also able to testify about how the foster family was facilitating those relationships.  From review of the record, we can discern no inadequacy in the GAL's investigation.  Nor do we discern any inappropriate or unfair prejudicial impact of her recommendation.  Father was given the opportunity to address those areas he claims the GAL neglected.  We further note that the Rules of Superintendence do not have the same force of statute or case law but are rather purely internal housekeeping rules which do not create substantive rights in individuals or procedural law.  *In re J.S.*, 12th Dist. Butler Nos. CA2016-07-141 and CA2016-07-142, 2016-Ohio-7833, ¶ 12.  Therefore, the degree of compliance with any such rule is generally not grounds for reversal.  *In re B.J.*, 12th Dist. Warren Nos. CA2016-05-036 and CA2016-05-038, 2016-Ohio-7440, ¶ 57.

{¶ 28} Father further argues that his failure to complete case plan services should not prevent reunification with A.W. because he is able to provide A.W. with a secure home and there was no evidence that his drug use had any negative impact on his ability to parent, citing a case where this court reversed a grant of permanent custody to an agency.  *In re Knuckles*, 12th Dist. Butler Nos. CA2003-01-004 and CA2003-01-005, 2003-Ohio-4418, ¶ 21.  However, that case is easily distinguishable.  *In re K.G.*, 2021-Ohio-2154, ¶ 17

---

4. The GAL testified at the August 10, 2021 hearing.  It was not until the final November 8, 2021 hearing that Father's counsel first indicated "my client intends to testify today asking for legal custody to be granted to him."  Up until that point, Father's counsel was focused on whether the parties were amenable to providing him with visitation rights in the event legal custody was granted.

(discussing the different ramifications of a grant of permanent custody as opposed to legal custody). In addition, *Knuckles* involved children of a much more mature age, and a family that was "well bonded." Additionally, the caseworker in *Knuckle*s had the advantage of in-home visits and interviews with the children involved. These are not the circumstances herein. We have previously distinguished *Knuckles* as other appellants have also mischaracterized its application. *In re B.T.H.*, 12th Dist. Butler No. CA2017-06-080, 2017-Ohio-8358, ¶ 46. Father's reliance on *Knuckles* is misplaced. While it is true that Father's drug use had some impact on his conduct, most notably his inability to visit with A.W. due to failure to pass three clean drug screens, we find that Father's drug use and parental abilities were not dispositive considerations. Rather, the juvenile court's primary consideration lies with A.W.'s best interests. *In re L.A.B.*, 2012-Ohio-5010 at ¶ 12.

{¶ 29} It is admirable that Father eventually took action to ascertain and legally establish himself as the biological father of A.W. However, Father's decision not to file a motion requesting custody earlier in the proceedings, and not expressing his commitment to be a custodial parent until actually at the hearing, suggests indecision. Yet Father's desire and commitment to be a significant person in A.W.'s life can still be manifested by Father's positive interactions and ongoing conduct.

{¶ 30} After a thorough review of the record, we find the juvenile court did not abuse its discretion by balancing the factors as it did and awarding legal custody to the foster parents, nor do we find the juvenile court's decision is against the manifest weight of the evidence. The record firmly establishes that A.W. is in a safe and stable home and has thrived in his placement with his foster family. The juvenile court focused appropriately on the best interest factors with A.W.'s developmental well-being and environmental stability in mind. The juvenile court's decision awarding legal custody to the foster parents is supported by the record. Accordingly, Father's first assignment of error is without merit.

{¶ 31} Assignment of Error No. 2:

{¶ 32} THE TRIAL COURT ERRED IN NOT GRANTING FATHER A SPECIFIC VISITATION SCHEDULE.

{¶ 33} In his second assignment of error, Father alleges the juvenile court erred by not granting him a specific visitation schedule. Father's residual parenting rights do include, among other things, "the privilege of reasonable visitation." R.C. 2151.011(B)(50). However, as this court has previously stated "R.C. Chapter 21 does not require the reasonable parenting time order to be specific." *In re C.A.*, 12th Dist. Butler No. CA2014-07-165, 2015-Ohio-1410, ¶ 29.

{¶ 34} In this case, the juvenile court provided Father with visitation which is to be arranged and scheduled at the discretion of the foster parents. The foster parents can determine if those visits should be supervised. We note that during the hearing, foster father testified that he was "very open" to facilitating any visits and stated that his only condition was that such visits be done safely and in a safe environment, citing concerns of mental health and potential drug abuse from anyone interacting with A.W.

{¶ 35} Upon review of the record, we find the juvenile court did not abuse its discretion in not crafting a more specific visitation schedule. As discussed in more detail above, Father has had limited contact with A.W. which renders Father practically a stranger to the young child. The juvenile court's order allows Father to exercise visitation rights in a manner that satisfies the foster parents' concerns. Based upon the evidence, we find the juvenile court did not err in its decision regarding visitation. Father's second assignment of error is overruled.

{¶ 36} Judgment affirmed.

M. POWELL, P.J., and HENDRICKSON, J., concur.