[Cite as *In re K.S.*, 2023-Ohio-1936.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| IN RE: | : | |
| K.S. | : | CASE NO. CA2022-09-081 |
| | : | O P I N I O N<br>6/12/2023 |
| | : | |
| | : | |
| | : | |


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2021-0191


Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

Jeannine C. Barbeau, for appellant.

Marcelina C. Woods, guardian ad litem.



**BYRNE, J.**

{¶1} The Butler County Court of Common Pleas, Juvenile Division, granted legal custody of "Kate,"[1] a minor child, to her maternal relatives. Kate's biological mother

---

1. "Kate" is a pseudonym adopted in this opinion for purposes of preserving the minor child's privacy and improving the readability of the opinion. *See In re A.P.*, 12th Dist. Warren No. CA2022-01-002, 2022-Ohio-3181, ¶ 2, fn.1.

("Mother") appeals from the juvenile court's decision. For the reasons discussed below, we affirm that decision.

## I. Facts and Procedural Background

## A. Proceedings Prior to the Legal Custody Hearing

{¶2} On July 26, 2021, the Children Services Division of the Butler County Department of Job and Family Services ("BCDJFS" or "the agency") filed a complaint alleging that Kate, then seven years old, was a dependent child pursuant to R.C. 2151.04(C). That statute defines a dependent child as a child "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship * * *." R.C. 2151.04(C).

{¶3} The complaint alleged that in July 2021, BCDJFS received information that Mother was using methamphetamine and heroin and had overdosed in Kate's presence. The complaint alleged that Kate's biological father ("Father") was currently incarcerated on a probation violation.[2]

{¶4} The complaint further alleged that Mother had admitted methamphetamine use and admitted that she overdosed in the presence of Kate in May 2021. Mother told the agency that she would have been dead if Kate had not found her.

{¶5} The complaint further stated that Mother had been in a detox treatment center between July 12, 2021 and July 22, 2021 and had been discharged with a recommendation to continue services at "Modern Psychiatry and Wellness." But on July 25, 2021, police took Mother to the hospital due to erratic behavior. She left the hospital immediately and the agency did not have communication with Mother between July 25 and the filing of the

---

2. Father has a history of substance abuse issues. He was incarcerated at times during the pendency of the case. He failed to maintain contact with the agency and was removed from the case plan. Father did not participate in this appeal.

complaint.

{¶6} BCDJFS requested that the court place Kate in its temporary custody, or that the court grant legal custody to another party deemed appropriate by the court. On the same day, the juvenile court granted an emergency ex parte order granting BCDJFS temporary custody of Kate. The agency placed Kate with her maternal aunt and uncle ("Aunt and Uncle").

{¶7} On August 26, 2021, the agency filed a case plan for reunification. The case plan called for Mother to engage in mental health and substance abuse treatment on her own, but if she did not follow through with those services, Mother would be recommended to complete a SAMI assessment and to follow all recommendations. In addition, Mother would be required to complete random drug screens at the request of her providers or the agency, and to sign releases for all service providers. Mother would need to obtain housing and ensure that she was able to meet the financial needs of the household.

{¶8} On September 13, 2021, the court held the adjudicatory hearing. After hearing the evidence, the court found Kate dependent as alleged in the complaint. The court continued all previous orders, including temporary custody with the agency. Although it is only referenced after the fact in the record, the agency orally requested that the court grant legal custody to Aunt and Uncle. This occurred during a hearing after Mother was released from the Warren County Jail in November 2021.

{¶9} In a January 20, 2022 entry following a review hearing, the court noted that Mother objected to the agency's request to grant legal custody of Kate to Aunt and Uncle. Prior to the hearing on legal custody, Mother moved the court to continue temporary custody for an additional six months. Mother stated that she was actively engaged in services, wished to reunify with Kate, and requested additional time to complete services.

{¶10} Prior to the legal custody hearing, Kate's guardian ad litem filed a report and

- 3 -

recommendation. The guardian ad litem recommended that Kate be placed in the legal custody of Aunt and Uncle and that visits between Kate and Mother be at Aunt and Uncle's discretion. Kate's court-appointed special advocate also filed a report and recommended that Kate be placed in Aunt and Uncle's legal custody.

## B. The Legal Custody Hearing

{¶11} The court held the legal custody hearing in April 2022. We will summarize the testimony of the witnesses presented at that hearing below.

{¶12} The agency submitted testimony and documentary evidence concerning Mother's involvement with the court system and children services. The agency had investigated Mother in 2016 following allegations that Mother and Father were using illicit substances in Kate's presence. At that time, Mother transferred legal custody of Kate to Aunt through a private custody transfer. Following this transfer of legal custody, the agency closed its case.

{¶13} In 2017, Mother petitioned the juvenile court to return Kate to her custody as she had obtained sobriety and was working services with the agency. Mother ultimately recovered legal custody of Kate.

{¶14} In 2018, Mother and Father were again found to be using illicit substances. The agency placed Kate on a safety plan, removed her from Mother's care, and placed her with a paternal relative. During this time, Father became incarcerated. Mother, however, engaged in case plan services. The agency closed the case after several months and Kate was placed back in Mother's care in 2019.

{¶15} In July 2021, the agency received the report that led to filing of the underlying complaint in this case and Kate's most recent removal. That month, Mother entered a detox facility where she remained for 10 days. After her discharge from that facility, she told the agency that she would go to Modern Psychiatry and Wellness, an outpatient treatment

center.  However, one day after leaving detox, Mother began using illicit substances again. Law enforcement took her to the hospital due to erratic behavior.  On July 30, 2021, law enforcement arrested Mother for drug possession.  Mother was then incarcerated from July 30, 2021, until August 17, 2021.

{¶16}  On August 23, 2021, Mother reported to the agency that she had been engaged in services at Modern Psychiatry and Wellness in a partial hospitalization program since August 20, 2021.  Despite this treatment, on August 25, 2021 Mother tested positive for Tetrahydrocannabinol ("THC").  On August 26, 2021, law enforcement arrested Mother on another drug possession charge.  Mother was then incarcerated until she was released on November 9, 2021.

{¶17}  On December 6, 2021, Mother reported that she had completed an assessment at Modern Psychiatry and Wellness and was recommended to engage in intensive outpatient substance abuse treatment.  She was supposed to begin treatment that day.  However, she reported that she had to stay home that day and did not begin treatment.

{¶18}  On January 3, 2022, Mother admitted to the agency that she had again relapsed.  She declined a drug screen.  Mother stated that she planned to check herself into an inpatient substance abuse treatment program with Modern Psychiatry and Wellness that day.

{¶19}  Reports from Modern Psychiatry and Wellness indicated that on January 4 and 5, 2022, upon entry into the substance abuse program, Mother tested positive for methamphetamine, amphetamine, benzodiazepine, buprenorphine, MDMA, and THC. Mother left the program on January 7, 2022.

{¶20}  On January 10, 2022, Mother entered residential substance abuse treatment at Woodhaven in Dayton, Ohio.  Upon admission, Mother tested positive for methamphetamine, amphetamines, THC, and opiates.

{¶21} On March 2, 2022, Mother was successfully discharged from Woodhaven. She then entered sober living and residential treatment at Sojourner. On March 13, 2022, Mother tested positive for THC and was discharged from Sojourner. On March 21, 2022, Mother completed a new assessment and was recommended to engage in intensive outpatient treatment with Sojourner.

**1. Social Worker Jamie Shope's Testimony**

{¶22} BCDJFS social worker Jamie Shope testified that she had been the social services worker assigned to Kate's case since August or September of 2021. Shope testified in detail as to the history of Mother's involvement with children services. Shope testified to Kate's current living situation with Aunt, Uncle, and Kate's cousin and observed that all of Kate's needs were being met living with Aunt and Uncle.

{¶23} Shope testified that Kate was not attending school regularly when she lived with Mother and was also spending a significant amount of time at a non-relative's home.

{¶24} Shope testified that the agency asked the court to grant legal custody to Aunt and Uncle after Mother once again relapsed on methamphetamine after her second release from jail in November 2021. The agency's primary concerns were with Mother's continued relapses and the back and forth of losing and regaining custody of Kate. Shope testified as to the impact of repeated removals on children, stating,

> It makes them scared of everyone. It makes them worry a lot more. It makes them, it matures them, makes them worry about things that kids don't typically worry about. * * * [T]hey become hypersensitive to unsafe situations.

Shope stated that she had observed this behavior in Kate. Shope also noted that Kate had witnessed Mother's drug abuse and was present during Mother's overdose. The agency asked for legal custody to be granted to Aunt and Uncle because of Mother's substantial history of involvement with the court system and children services.

{¶25}  Shope testified that at the time of the hearing Mother was on probation for two drug charges and that part of her probation required her to engage in a drug program. Shope agreed that Mother only had one positive test for THC after she was successfully discharged from Woodhaven and that Mother had disputed the results of that test and subsequent drug screens had not been positive for THC.

### 2. Aunt's Testimony

{¶26}  Aunt testified concerning Kate's history of living with Aunt and her family.  Aunt described the current living situation and explained how her home has been a "nice landing pad" for Kate when Mother's substance abuse issues reassert themselves.  Aunt did not think it was realistic that her sister—that is, Mother—could remain sober.  Aunt believed that granting legal custody to Aunt and Uncle was the right thing to do because, Kate was "older. She's seen a lot more. * * * She has seen and witnessed a lot more.  She's hurt hard. * * * I don't want my niece to ever go through what she had just went through."  Aunt stated that she would facilitate visits between Mother and Kate and would liberalize visitation time if Mother continued her sobriety.

### 3. Mother's Case

{¶27}  Mother did not testify, but she elicited testimony from her best friend and Kate's paternal grandfather.  Both witnesses testified that they believed they saw a difference in Mother, in terms of her ability to be able to remain sober.  Mother's best friend testified that she had no concerns that Mother might relapse.

### C. The Legal Custody Decision

{¶28}  A magistrate issued a decision exhaustively reviewing the history of the case as well as the evidence relevant to Kate's best interests.  The magistrate noted the following regarding Kate's bests interests and Mother's request for an extension of temporary custody:

[T]here has been extensive agency involvement with this family pertaining to substance abuse issues. Despite repeated agency involvement and a prior custody change, Mother appears to have regained custody, but has continued to experience relapses. Despite testimony from the paternal grandfather and Mother's best friend as to their knowledge that Mother had resumed abusing substances, they took no actions to protect the child or notify the agency such that this child was left in the care of her mother to find her mother "dead"[3] in the bathroom with a needle in her arm. Mother does not have [just a] minor history of substance abuse. Mother has been abusing hard drugs, according to her best friend, since 2013. Mother has had multiple attempts at treatment. Yet after convincing [Aunt] that she was clean and that the child would be safe in her care, she has relapsed repeatedly. Mother has only been out of residential treatment since the beginning of March 2022. Although she asks for a six month extension of custody in order to provide her another opportunity for ongoing treatment, she failed to provide this Magistrate with evidence that the child would benefit from further delay. The amount of time Mother needs to demonstrate sobriety far exceeds any amount of reasonable time left for this case to be determined.

{¶29} The magistrate ultimately issued a decision recommending that the juvenile court grant legal custody to Aunt and Uncle. The court adopted the decision as its own on the same day.

{¶30} Mother objected to the magistrate's decision. Among her reasons for objecting, Mother argued that the legal custody decision was contrary to the manifest weight of the evidence. The juvenile court held an objection hearing and subsequently issued an order denying Mother's various objections.

{¶31} Mother appealed and has raised two assignments of error, which we review out of the order presented.

## II. Law and Analysis

### A. Appointment of New Guardian Ad Litem

{¶32} Mother's Assignment of Error No. 2 states:

---

3. Mother was not dead, but nearly so. She required four hits of Narcan to be revived.

THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT BY NOT SEPARATING THE ROLES OF GUARDIAN AD LITEM AND ATTORNEY FOR THE CHILD DUE TO A POTENTIAL CONFLICT OF INTEREST.

{¶33} Mother argues that the trial court erred by failing to appoint a new guardian ad litem after a potential conflict of interest arose between Kate's wishes and the guardian ad litem's recommendation. Mother argues that Kate "expressed a desire to be with Mother" but that the guardian ad litem did not inform the juvenile court of Kate's wishes and instead recommended that the court grant legal custody to Aunt and Uncle. Mother admits that the court conducted an in camera interview of Kate but argues that the court "did not appear to take the child's wishes into consideration."

{¶34} We are precluded from reviewing this issue. Objections to a magistrate's decision must be "specific and state with particularity all grounds for objection." Juv.R. 40(D)(3)(b)(ii). The failure to file specific objections is treated the same as the failure to file any objections. *In re K.L.F.*, 12th Dist. Butler Nos. CA2020-08-083 and CA2020-08-084, 2021-Ohio-2290, ¶ 9, citing *In re J.F.*, 12th Dist. Butler No. CA2016-08-174, 2017-Ohio-1492, ¶ 14. Juv.R. 40(D)(3)(b)(iv) provides that "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion * * * unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b)." This court has previously ruled that unless the appellant argues a claim of plain error, the appellant has waived claimed errors not objected to below. *K.L.F.*, citing *State v. J.A.C.*, 12th Dist. Warren Nos. CA2017-04-044 and CA2017-04-045, 2018-Ohio-361, ¶ 30.

{¶35} Mother never raised the issue of the guardian ad litem having a potential conflict of interest to the juvenile court. Mother objected to the magistrate's legal custody decision, but she did not object on the basis that the decision was erroneous because the

court failed to appoint Kate a new guardian ad litem. Moreover, Mother does not claim or argue plain error on appeal. "It is well recognized that the failure to draw a trial court's attention to possible error when the error could have been corrected results in a waiver of the issue for purposes of appeal." *K.L.F.* at ¶ 10, citing *J.F.* at ¶ 15. Mother is therefore precluded from raising this issue on appeal. *K.L.F.* at ¶ 10.

{¶36} However, even if Mother were not precluded from assigning the guardian ad litem's potential conflict of interest and the trial court's failure to appoint a new guardian ad litem as error on appeal, we would find her argument meritless and would not find error, much less plain error. Mother acknowledges that the juvenile court conducted an in camera interview of Kate but claims that the court disregarded Kate's wishes. However, the magistrate's decision indicates that it conducted the in camera interview with Kate and that "additionally" the magistrate considered the guardian ad litem's and the court-appointed special advocate's recommendations regarding Kate's custody. This language suggests that the court considered Kate's wishes.

{¶37} In any event, the record does not support Mother's argument that Kate "expressed a desire to be with Mother." Mother cites no portion of the record for this claim. Our independent review of the record indicates that while Kate might prefer to be with Mother, she is unfortunately cognizant of the reality that she cannot be placed in Mother's care at this time due to Mother's substance abuse issues. Instead, according to the guardian ad litem's report, Kate was content to stay with Aunt and Uncle until such time that Mother could demonstrate that she could care for Kate. The record does not support that Kate has "consistently and repeatedly expressed a strong desire that is inconsistent with the guardian ad litem's recommendations." *In re M.H.*, 12th Dist. Fayette No. CA2012-11-035, 2013-Ohio-1063, ¶ 34 (noting that the appointment of independent counsel is generally necessary when the child has consistently expressed desires inconsistent with the guardian

ad litem's recommendations). We overrule Mother's second assignment of error.

## B. Manifest Weight of the Evidence and Best Interest Factors

{¶38} Mother's Assignment of Error No. 1 states:

> THE TRIAL COURT'S DECISION AND ORDER GRANTING LEGAL CUSTODY OF K.S. TO RELATIVES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IT WAS CONTRARY TO THE BEST INTEREST OF THE CHILD, AND THERE WAS INSUFFICIENT CLEAR AND CONVICING EVIDENCE TO SUPPORT THE DECISION.

{¶39} Mother argues that the juvenile court's decision to grant legal custody to Aunt and Uncle and to not extend temporary custody was not in Kate's best interest, was against the manifest weight of the evidence, and was not supported by sufficient evidence.[4]

## 1. Applicable Law: Legal Custody and Best Interest Factors

{¶40} Pursuant to R.C. 2151.353(A)(3), if a child is adjudicated an abused, neglected, or dependent child, the juvenile court may award legal custody of a child "to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child * * *." Legal custody may be awarded to a nonparent upon a demonstration by a preponderance of the evidence that granting legal custody to the nonparent is in the child's best interest. *In re L.C.*, 12th Dist. Warren No. CA2019-08-086, 2020-Ohio-4629, ¶ 14. A preponderance of the evidence is evidence that is of a greater weight or more convincing than the evidence which is in opposition to it. *In re K.M.*, 12th Dist. Butler No. CA2019-01-015, 2019-Ohio-1833, ¶ 37.

{¶41} R.C. 2151.353(A) does not independently set forth factors that a court must consider in determining the child's best interests in a request for legal custody. *In re F.B.*,

---

4. The phrasing of Mother's assignment of error suggests she is also asserting a sufficiency-of-the-evidence argument. Despite the phrasing, the substance of Mother's arguments is in the nature of a challenge to the weight of the evidence. In any event, this court's determination that a juvenile court's decision is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency. *See In re C.I.R.*, 12th Dist. Butler No. CA2018-06-123, 2019-Ohio-335, ¶ 15.

12th Dist. Brown No. CA2021-03-002, 2022-Ohio-499, ¶ 43. In determining the best interests of the child, the juvenile court must consider all relevant factors. *In re A.M.W.*, 12th Dist. Butler No. CA2021-12-159, 2022-Ohio-2913, ¶ 18. A court may therefore consider the relevant best interest factors set forth in either R.C. 3109.04(F) or R.C. 2151.414(D) in determining the best interest of the child. *In re K.S.*, 12th Dist. Warren Nos. CA2019-01-009 and CA2019-02-015, 2019-Ohio-2384, ¶ 37. R.C. 3109.04(F)(1) provides:

> In determining the best interest of a child pursuant to this section, * * * the court shall consider all relevant factors, including, but not limited to:
>
> (a) The wishes of the child's parents regarding the child's care;
>
> (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
>
> (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
>
> (d) The child's adjustment to the child's home, school, and community;
>
> (e) The mental and physical health of all persons involved in the situation;
>
> (f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
>
> (g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
>
> (h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act

that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i)  Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j)  Whether either parent has established a residence, or is planning to establish a residence, outside this state.

R.C. 2151.414(D)(1) provides:

In determining the best interest of a child * * *, the court shall consider all relevant factors, including, but not limited to, the following:

(a)  The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b)  The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c)  The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶42} As the paramount concern is the best interest of the child, the court "should consider the totality of the circumstances affecting the best interest of the child." *In re S.L.,* 12th Dist. Butler Nos. CA2012-07-137 thru CA2012-07-142 and CA2012-07-147 thru CA2012-07-149, 2013-Ohio-781, ¶ 54.

**2. Standard of Review**

{¶43} The juvenile court enjoys broad discretion in custody proceedings. *In re L.W.,* 12th Dist. Preble No. CA2020-12-019, 2021-Ohio-2461, ¶ 31. As a result, "[t]his court reviews the juvenile court's custody determination for an abuse of discretion." *In re A.S.,* 12th Dist. Warren No. CA2022-11-074, 2023-Ohio-1607, ¶ 19, citing *In re S.K.,* 12th Dist. Butler No. CA2013-06-108, 2014-Ohio-563, ¶ 12. "An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable." *In re A.S.* at ¶ 19, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). The discretion that a juvenile court enjoys in custody matters "'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *In re J.M.*, 12th Dist. Warren No. CA2008-12-148, 2009-Ohio-4824, ¶ 17, quoting *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). A reviewing court must not substitute its judgment for that of the juvenile court when applying the abuse of discretion standard. *In re J.W.*, 12th Dist. Butler No. CA2019-07-108, 2020-Ohio-322, ¶ 23.

{¶44} "Moreover, a challenge to the manifest weight of the evidence involves the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *In re A.S.* at ¶ 19, citing *Eastley v. Volkman*, 132 Ohio

St.3d 328, 2012-Ohio-2179, ¶ 12.  In a manifest weight challenge,

> the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*In re A.F.,* 12th Dist. Butler No. CA2019-01-005, 2019-Ohio-4627, ¶ 20.  "Where an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court."  *In re T.M.*, 12th Dist. Butler No. CA2007-01-019, 2007-Ohio-6034, ¶ 28, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997).

### 3. Analysis

{¶45}  Mother argues that she was compliant with her case plan services and had been engaged with mental health and substance abuse treatment.  She points out that she was actively engaged in substance abuse treatment at the time of the legal custody hearing.  Mother contends that the juvenile court abused its discretion by not extending temporary custody for another six months to address any concerns the court may have had over the possibility of her relapsing again and to allow her time to complete services.  Mother also sets forth her view of the evidence relevant to the R.C. 3109.04(F)(1) best interest factors that she believes weighed in favor of her request for an extension of temporary custody.

{¶46}  The juvenile court's decision addressed the evidence it found relevant to the best interest factors, and Mother does not challenge any of the juvenile court's specific findings.  Instead, she simply sets forth how she believes the court should have analyzed the R.C. 3109.04(F)(1) best interest factors.  For example, with regard to R.C. 3109.04(F)(1)(a) (that is, the factor regarding "the wishes of the child's parents regarding the child's care"), Mother argues that the court disregarded that it was *her* wish for an

extension of temporary custody and that *she* opposed legal custody being granted to Aunt and Uncle.

{¶47} Initially, we note that there is no evidence to support Mother's suggestion that the juvenile court ignored her wishes. But in essence, Mother's arguments amount to her disagreement with the juvenile court's ultimate decision rather than a disagreement with the facts supporting that decision. Contrary to Mother's arguments, the record contains substantial competent and credible evidence supporting the juvenile court's legal custody determination.

{¶48} That evidence includes Mother's lengthy history of substance abuse issues and involvement with children services. Mother's issues in this regard caused her to relinquish Kate's custody to Aunt and Uncle in 2016. After gaining sobriety, she was able to regain custody. She remained sober after that for a relatively long time, for approximately one and one-half years. However, she eventually relapsed, and children services had to intervene and remove Kate once again while Mother regained her sobriety.

{¶49} BCDJFS initiated the present case when Mother relapsed in 2021 and after Kate discovered Mother overdosed in a bathroom. The record reflects that it took multiple doses of Narcan to revive Mother. After the agency received information about this incident, Kate was removed on an emergency basis and placed with Aunt and Uncle. Even before Kate's removal, the record indicates that Kate was spending a considerable amount of time outside of Mother's care and in the care of non-relatives while Mother was using methamphetamine.

{¶50} Social worker Shope testified as to the effect of repeated removals on a child, including causing fear, worry, and hypersensitivity. Shope testified that she had observed these negative effects in Kate.

{¶51} Mother did not demonstrate a commitment to maintaining her sobriety and

reunifying with Kate until shortly before the legal custody hearing and many months after Kate's removal. Instead, Mother's addictions appeared to have been a stronger force in her life than the desire to remain sober and regain custody.

{¶52} It may be true that Mother was sober at the time of the legal custody hearing. But this was a very recent development following multiple attempts at treatment that were followed by relapses in the months before the hearing. Mother's history of relapses, even after long periods of sobriety, further underscored the point that a six-month extension of temporary custody was not in Kate's best interest. Given Mother's history, the chances of another relapse were high.

{¶53} Kate deserved stability and an award of legal custody to Aunt and Uncle was clearly and convincingly the best method to achieve that stability. The greater weight of the evidence demonstrated that Kate was thriving in her placement with Aunt and Uncle. She was doing much better at school, in terms of both performance and attendance. The stability provided by a grant of legal custody to caregivers without substance abuse issues was obviously beneficial for Kate's physical and mental health.

{¶54} For the foregoing reasons, we hold that the juvenile court did not abuse its discretion in granting legal custody to Aunt and Uncle and in denying Mother's request for a six-month extension of temporary custody. Nor was the juvenile court's decision against the manifest weight of the evidence or supported by insufficient evidence. We overrule Mother's first assignment of error.

{¶55} We understand Mother believes she will be able to maintain sobriety. We note that if Mother maintains her sobriety, she may in the future be able to regain legal custody of Kate. This case involves a grant of legal custody, not a grant of permanent custody. Unlike an award of permanent custody, an award of legal custody does not terminate the parent-child relationship. *In re A.M.W.*, 12th Dist. Butler No. CA2021-12-159, 2022-Ohio-

2913, ¶ 16.  Though legal custody of Kate has been granted to Aunt and Uncle, Mother retains her residual parental rights and responsibilities, and this includes visitation rights and a duty of support.  *Id*.  Aunt testified that she would facilitate visits between Mother and Kate and would liberalize visits if Mother was doing well.  Regardless, the grant of legal custody to Aunt and Uncle was not as drastic of a remedy as a grant of permanent custody and Mother can continue to work towards reunification.  We of course express no opinion at this time on whether that may be appropriate in the future.

### III. Conclusion

{¶56}  For the foregoing reasons we overrule both of Mother's assignments of error.

{¶57}  Judgment affirmed.

PIPER, P.J., and M. POWELL, J., concur.