[Cite as *In re E.T.J.*, 2026-Ohio-977.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| E.T.J. | : | CASE NOS. CA2025-08-093<br>CA2025-08-097 |
| | : | <u>OPINION AND</u><br><u>JUDGMENT ENTRY</u> |
| | : | 3/23/2026 |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2021-0080

Mother, J.H., pro se.

Father, N.J, pro se.

Ched H. Peck, for appellee, L.F.

**O P I N I O N**

**HENDRICKSON, P.J.**

{¶ 1}  Mother and Father, pro se appellants, separately appeal a decision of the

Butler County Court of Common Pleas, Juvenile Division, denying their respective

motions for visitation with their son, E.T.J. For the reasons set forth below, we affirm the juvenile court's decision.

## I. FACTS & PROCEDURAL HISTORY

{¶ 2}   E.T.J. was born on October 28, 2020 to Mother and Father. At the time of E.T.J.'s birth, Mother was married to another man. Father's paternity was not legally established until January 25, 2024, though E.T.J.'s paternity was known by the parties since his birth. At the time E.T.J. was born, Mother tested positive for THC. She subsequently tested positive for methamphetamine and amphetamine. On December 18, 2020, E.T.J. was placed in Maternal Grandmother's temporary custody. Neither Mother nor Father were to have any unsupervised contact with the child. E.T.J.'s placement with Maternal Grandmother only lasted a short while, until March 12, 2021, as E.T.J. was diagnosed as "failing to thrive" and it was discovered that Mother and Father were having unsupervised contact with the child.

{¶ 3}   On March 17, 2021, the Butler County Department of Jobs and Family Services ("the Agency") filed a complaint, alleging that E.T.J. was a dependent child. E.T.J. was subsequently adjudicated dependent and placed in the Agency's temporary custody. He was placed in the home of a nonrelative, who had previously provided care for the child. On October 19, 2022, the Nonrelative Caregiver was designated as E.T.J.'s legal custodian. E.T.J. has remained in the Nonrelative Caregiver's home since that time. Maternal Grandmother was granted limited companionship time with E.T.J., consisting of a weekly four-hour weeknight visit and an overnight visit on alternating weekends, as arranged by Maternal Grandmother and the Nonrelative Caregiver. Pursuant to the juvenile court's October 19, 2022 entry, Father was to have no contact with the child and Mother was permitted supervised contact with E.T.J. at the discretion of the Nonrelative

Caregiver.

{¶ 4} For a period of time, Maternal Grandmother exercised her companionship time without incident. However, in August 2023, the Nonrelative Caregiver learned that Mother and Father had been arrested and had reported that they resided at Maternal Grandmother's home. This concerned the Nonrelative Caregiver, as she believed Maternal Grandmother was permitting E.T.J. to have contact with his parents in violation of the juvenile court's order. The Nonrelative Caregiver started to refuse Maternal Grandmother companionship time with the child.

{¶ 5} Thereafter, a flurry of motions were filed in the juvenile court concerning E.T.J.'s custody and visitation or companionship time with him. On September 9, 2023, Maternal Grandmother filed a motion seeking custody of E.T.J. The Nonrelative Caregiver responded on September 19, 2023 by filing a Motion to Modify or Restrict Visitation. On November 3, 2023, Mother filed a Motion for Visitation/Parenting Time. These three motions were set to be heard on November 8, 2023. However, due to problems serving Mother's husband, E.T.J.'s presumed father, with the motions, the motion hearing was continued. On November 9, 2023, Maternal Grandmother filed an Amended Motion for Custody or in the Alternative to Modify Parenting Time. On January 3, 2024, Father filed a Motion for Visitation, attaching lab reports and a CSEA Administrative Order regarding his paternity of E.T.J.

{¶ 6} At a hearing held on January 25, 2024, the juvenile court found Father's paternity of E.T.J. to be established. The court appointed a guardian ad litem ("GAL") to the case. At a subsequent hearing held on March 14, 2024, the juvenile court ordered that while Maternal Grandmother's September 19, 2023 and November 9, 2023 motions for custody remained pending, Maternal Grandmother was to have weekly visitation with

E.T.J. at the Family Healing Center. In May 2024, a new GAL was appointed to the case when the former GAL had to withdraw due to a medical emergency.

{¶ 7}   On August 5, 2024, Maternal Grandmother moved to have the Nonrelative Caretaker found in contempt for not following the court's March 14, 2024 visitation order. Following a pretrial hearing on August 13, 2024, the juvenile court modified its temporary order on visitation, ordering that Maternal Grandmother could have two hours of visitation with E.T.J. at a local park every week. The court indicated that the GAL could liberalize visitation for Maternal Grandmother by allowing the visits to occur in Maternal Grandmother's home or at her sister's home. The court further indicated that Mother and Father would be permitted to have visitation if agreed upon by the GAL and all parties in writing. The court then set a motion hearing on all pending motions for December 5, 2024. However, at Maternal Grandmother's and the Nonrelative Caregiver's requests, the hearing was continued on two occasions until January 30, 2025.[1]

{¶ 8}   The January 30, 2025 motion hearing was held before a magistrate. Mother, Father, the GAL, the Nonrelative Caregiver, and Maternal Grandmother all testified. As pertinent to the present appeal, their testimony revealed the following.

{¶ 9}   Mother and Father have been residing with Maternal Grandmother since August 2023. Mother and Father both have a history of substance abuse issues, testing positive for methamphetamine in 2020 and 2021. Father also has a gambling addiction and mental health issues. As of October 2022, when E.T.J. was placed in the Nonrelative Caregiver's legal custody, Mother and Father were still struggling with their addiction issues. While on drugs and in the throes of Father's gambling addiction, Mother and

---

1. Maternal Grandmother requested the first continuance and, in her motion, represented that neither Mother nor Father had an objection to the continuance. The motion hearing was continued a second time at the request of the Nonrelative Caretaker, whose counsel had an emergency.

Father engaged in criminal activity.

{¶ 10} In May 2022, Mother and Father were indicted in the Warren County Court of Common Pleas on charges of identity fraud and possessing criminal tools, felonies of the  fifth degree. The charges related to conduct that occurred in April 2022. Mother and Father pled guilty to the charges and were granted intervention in lieu of conviction ("ILC") in October 2023. Mother and Father testified they were successful in completing ILC in advance of the court-ordered time requirements. Father testified ILC requirements were completed within 13 months.

{¶ 11} In August 2023, after Mother and Father were indicted in Warren County but before they were placed on ILC, Mother and Father were the subject of a traffic stop in Butler County, Ohio. Both Mother and Father had outstanding warrants for their arrest. During the traffic stop, officers found multiple identification cards belonging to Mother and Father, all of which had varying driver's license numbers and names on them. Officers also found license plates, social security cards, ID cards, and tax paperwork for several other individuals inside the vehicle. Finally, the officers found checks that appeared to have been wet and then dried with new handwriting on them. No charges relating to the Butler County traffic stop had been filed as of the date of the January 30, 2025 motion hearing.

{¶ 12} Mother and Father did, however, face additional charges in the Montgomery County Court of Common Pleas for criminal offenses that occurred between March 2, 2023 and June 14, 2023. Mother and Father entered guilty pleas on January 27, 2025 to two counts of forgery and one count of receiving stolen property, all felonies of the fifth degree. Sentencing on the Montgomery County charges was scheduled to occur in late February 2025. At the time of the January 30, 2025 motion hearing before the juvenile

court, it was unknown whether Mother and Father would be incarcerated on the Montgomery County charges.

{¶ 13} Mother, Father, and Maternal Grandmother testified that Mother and Father have made significant progress in overcoming their addictions since the juvenile court's last custody determination. Mother testified that she has been sober for 18 months, has taken weekly classes for more than a year at Community Behavioral Health ("CBH") for her mental health and substance abuse issues, and has been seeing a counselor monthly. Father received treatment for his gambling addiction at CBH and has undergone mental health treatment as part of his ILC requirements. Father testified he also received substance abuse treatment through a counselor whom he still sees. Father is employed, working 20 to 50 hours per week doing installations for a furniture company. Father is interested in going back to school to be trained in electrical work. Mother is not currently working, as she recently gave birth to her and Father's daughter. The child is now three months old. No children services agency is involved with this child.

{¶ 14} Mother and Father both desire contact with E.T.J. Father testified that he has not been in the same room with E.T.J. since the no-contact order was put in place in October 2022. Mother has not had parenting time with E.T.J. since he was placed in the Nonrelative Caregiver's legal custody on October 19, 2022. Though the juvenile court's prior orders permitted Mother to have supervised contact with E.T.J. at the discretion of the Nonrelative Caregiver, Mother never personally contacted the Nonrelative Caregiver to ask for visitation. Instead, her requests for visitation were conveyed through Maternal Grandmother.

{¶ 15} In both a written report filed with the court on January 30, 2025 and in her trial testimony, the GAL expressed reservations about permitting Mother and Father

visitation with E.T.J. at this time. Due to their history, the GAL was concerned about Mother's and Father's ability to maintain sobriety and refrain from criminal conduct when not subject to court supervision or ILC requirements. The GAL worried that it would be harmful for E.T.J. to be introduced to Mother and Father only to have them regress into their prior bad behaviors. The GAL believed the better course of action was for Mother and Father to take additional time to maintain their sobriety and demonstrate stability "without the threat of jail or prison hanging over their heads." The GAL recommended that visitation for Mother and Father be "revisited in another year if they are still clean [and] sober and [there are] no more criminal charges."

{¶ 16} On April 22, 2025, after considering the testimony and exhibits presented at the motion hearing, the magistrate issued a decision in which it denied Maternal Grandmother's motion for custody of E.T.J., granted the Nonrelative Caregiver's motion to modify or restrict Maternal Grandmother's visitation, and denied Mother's and Father's respective motions for visitation. Grandmother's visitation was modified to an eight-hour unsupervised visit with E.T.J. on every other Saturday, with the stipulations that the visit could not take place in Grandmother's home and Grandmother could not allow contact of any kind between Mother, Father, and E.T.J. during her visits. With respect to Mother's and Father's motions for visitation, the magistrate found the motions "premature" and held that if Mother and/or Father filed a motion for visitation "one year from the date of [its] decision, it shall be readdressed at that time so long as [the parent] has remained sober and free of additional criminal behavior." In denying Mother's and Father's motions, the magistrate reasoned as follows:

> At this point, both parents have demonstrated a long history of not acting in a manner that is in this child's best interest. With that said, they have also begun to establish and demonstrate that they are serious about remaining sober and

free from criminal behavior. It is commendable and must be acknowledged. Mother and Father should be proud of the progress they have made as it should absolutely be a benefit to them in every aspect of their lives. Although, as the GAL points out, they have yet to be free of the criminal justice system during the time since the last custody determination. The court sincerely hopes that they continue their efforts and have continued success in remaining both sober and free from criminality. Further, it may be a path to a future that includes Mother and Father becoming an important part of [E.T.J.'s] life.

The court finds that it is in the child's best interest for both Mother and Father to continue to demonstrate they can remain sober and free of criminal behavior before they should be ordered to have parenting time with their child. The court finds that after one year from the date of this decision, so long as Mother and/or Father has remained free from criminal behavior and illegal drug use, the issue of Mother and Father's parenting time may be revisited.

{¶ 17} Mother and Father, acting pro se, filed separate, timely objections to the magistrate's decision. Mother objected to the decision to not "allow visitation after alienation from guardian prior to court date and guardian ad litem's lack of interaction to decide what is best for child." Father objected to the decision not "to allow visitation, once paternity was established my parental right to see my child was never exerci[s]ed." Both parents asked the court to reconsider their request for visitation. A hearing on the objections was held on July 15, 2025. Following the hearing, the juvenile court overruled Mother's and Father's objections and adopted the magistrate's decision.

{¶ 18} Mother and Father separately appealed the juvenile court's decision. Mother raised two assignments of error and Father raised three assignments of error for review. Where related, we will address Mother's and Father's assignments of error together.

## II. STANDARD OF REVIEW

{¶ 19} As an initial matter, we note that a juvenile court's judgment concerning the

grant or denial of parental visitation is reviewed for an abuse of discretion. *In re A.J.*, 2024-Ohio-1836, ¶ 21 (12th Dist.); *In re L.D.*, 2024-Ohio-4610, ¶ 21 (6th Dist.). An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *In re J.A.*, 2017-Ohio-5848, ¶ 14 (12th Dist.). Given the nature of the proceeding and the impact the court's determination will have on the life of the parties concerned, the discretion that a juvenile court enjoys in custody and visitation matters should be afforded the utmost respect. *Id.* "A reviewing court must not substitute its judgment for that of the juvenile court." *Id.*

### III. ANALYSIS

### A. Best Interests

{¶ 20} Mother's First Assignment of Error:

{¶ 21} THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED APPELLANT'S DUE PROCESS RIGHTS BY DENYING ALL VISITATION WITHOUT MAKING THE REQUIRED FINDINGS UNDER R.C. 3109.051 AND WITHOUT CONSIDERING THE STATUTORY BEST-INTEREST FACTORS.

{¶ 22} Father's First Assignment of Error:

{¶ 23} THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED FATHER'S DUE PROCESS RIGHTS BY DENYING ALL VISITATION WITHOUT MAKING THE REQUIRED FINDINGS UNDER R.C. 3109.051 AND WITHOUT CONSIDERING THE STATUTORY BEST-INTEREST FACTORS.

{¶ 24} Mother and Father argue, in their respective first assignments of error, that the juvenile court abused its discretion in denying their motions for visitation without considering the statutory best interest factors or making "required findings" under R.C. 3109.051. They further contend that the juvenile court ignored evidence of their

rehabilitation and stability.

{¶ 25} Except for a claim of plain error, we are precluded from reviewing Mother's and Father's arguments due to their failure to raise these specific arguments as objections to the magistrate's decision. "Objections to a magistrate's decision must be 'specific and state with particularity all grounds for objection.'" *In re A.J.*, 2024-Ohio-1836, at ¶ 18 (12th Dist.), quoting Juv.R. 40(D)(3)(b)(ii). "The failure to file specific objections is treated the same as the failure to file any objections." *Id.*; *In re K.S.*, 2023-Ohio-1951, ¶ 34 (12th Dist.). Juv.R. 40(D)(3)(b)(iv) provides that "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion . . . unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b)."

{¶ 26} Although Mother and Father filed objections to the magistrate's April 22, 2025 decision, neither parent specifically raised the issue of the magistrate's failure to consider the statutory best interest factors or make required findings under R.C. 3109.051. Neither Mother nor Father claim or argue plain error on appeal with respect to these issues. "It is well recognized that the failure to draw a trial court's attention to possible error when the error could have been corrected results in a waiver of the issue for purposes of appeal." *In re K.L.F.*, 2021-Ohio-2290, ¶ 10 (12th Dist.). Mother and Father are therefore precluded from raising this argument on appeal.

{¶ 27} However, even if we review Mother's and Father's arguments that the magistrate failed to consider the statutory best interest factors or make required findings under R.C. 3109.051 for plain error, we find their arguments to be without merit. "Plain error in the civil context is 'extremely rare' and this court must find that the error involves 'exceptional circumstances' where the error 'rises to the level of challenging the legitimacy

of the underlying judicial process itself.'" *In re J.W.*, 2018-Ohio-1781, ¶ 13 (12th Dist.), quoting *Goldfuss v. Davidson*, 1997-Ohio-401, ¶ 28 (1997). "The doctrine implicates errors that are 'obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse affect on the character and public confidence in judicial proceedings.'" *In re J.M.*, 2019-Ohio-3716, ¶ 14 (12th Dist.), quoting *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209 (1982).

{¶ 28} It is unclear from their briefs what specific "findings" Mother and Father believe the juvenile court was required to make pursuant to R.C. 3109.051 that the court omitted. Nonetheless, our review of the record reveals that the juvenile court considered the best interest of the child and set forth findings of fact and conclusions of law when denying Mother's and Father's respective motions for visitation.

{¶ 29} "[W]here a child has been adjudicated dependent and the child's legal custody has been granted to a non-parent, a natural parent's retained privilege of reasonable visitation does not include visitation that the court finds to be contrary to the child's best interest in light of the totality of the circumstances." *In re M.E.*, 2013-Ohio-2562, ¶ 26 (10th Dist.). "The court's primary consideration should always be the best interest of the child." *In re A.J.*, 2024-Ohio-1836, at ¶ 21 (12th Dist.). "To further the child's best interest, the juvenile court has the discretion to limit or restrict visitation rights," including the "power to . . . deny visitation rights altogether if visitation would not be in the best interests of the child." *Id.* In considering the child's best interests, the juvenile court may consider the factors set forth in R.C. 3109.051(D). *In re M.E.* at ¶ 27; *In re C.J.*, 2011-Ohio-3366, ¶ 15 (4th Dist.). Such factors include, but are not limited to, (1) the prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity; (2) the geographical location and distance

between the parents and the child's residence; (3) the child's and parents' available time; (4) the age of the child; (5) the child's adjustment to home, school, and community; (6) the wishes and concerns of the child regarding visitation as expressed to the court, if the child has been interviewed in chambers; (7) the health and safety of the child; (8) the amount of time that will be available for the child to spend with siblings; (9) the mental and physical health of all parties; (10) each parties willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights, (11) whether either parent previously has been convicted or pled guilty to any criminal offense involving any act that resulted in a child being adjudicated an abused or neglected child; (12) whether a person other than a parent who is seeking visitation has been convicted or pled guilty to any criminal offense that resulted in a child being adjudicated an abused or neglected child; (13) whether there has been a continuous and willful denial of parenting time that was ordered by the court; (14) whether either parent has established a residence or is planning to establish a residence outside the state; (15) the wishes and concerns of the child's parents if a person other than a parent is requesting visitation or companionship time; and (16) any other factor in the best interest of the child. R.C. 3109.051(D)(1)-(16).

{¶ 30} Contrary to Mother's and Father's assertions, the record demonstrates that the juvenile court expressly considered E.T.J.'s best interests before denying Mother's and Father's motions for visitation. The magistrate's decision, which was adopted by the juvenile court, identified each factor set forth in R.C. 3109.051(D) and engaged in a discussion of facts pertinent to each factor. As the juvenile court noted, testimony and evidence from the motion hearing indicated that Mother and Father have a significant history of drug use and criminal wrongdoing. Though they have taken substantial strides in turning their life around, which is truly commendable, their progress was of limited

duration (approximately 18 months) and occurred only after they were subject to court supervision and sobriety requirements that fell under that supervision. That is not to say that Mother's and Father's efforts should be discounted or that they can never have visitation or a relationship with E.T.J. while under court supervision for criminal wrongdoing. Rather, the totality of the circumstances must be examined to determine what is in E.T.J.'s best interest.

{¶ 31} Looking at the totality of the circumstances in this case, we find that the juvenile court did not commit plain error, much less abuse its discretion, when it denied Mother's and Father's respective motions for visitation. At the time of the motion hearing, E.T.J. had not seen Mother or Father in nearly two-and-one-half years. He was not bonded to either of his biological parents and viewed the Nonrelative Caregiver's family as his own. Mother and Father, though making important strides in sobriety and stability, were only 18 months sober—the majority of which time they were under ILC or other court-ordered supervision. Both were still actively involved in pending criminal cases. They were subject to be sentenced in Montgomery County on three felony offenses. It was unknown whether they would receive community control sanctions or be sentenced to a prison term. Given these facts, we find that the juvenile court did not err when it found it was in E.T.J.'s best interest for "both Mother and Father to continue to demonstrate they can remain sober and free of criminal behavior before they should be ordered to have parenting time with their child." Though Mother and Father are understandably anxious to reestablish contact and a connection with their son, the record supports the juvenile court's denial of their respective motions for visitation. As the juvenile court noted, the denial of visitation is not permanent—it can be revisited a year from the court's decision "so long as Mother and/or Father has remained free from criminal behavior and illegal

drug use." Mother's first assignment of error and Father's first assignment of error are, therefore, overruled.

**B. Delay In Addressing Motions**

{¶ 32} Mother's Second Assignment of Error:

{¶ 33} THE TRIAL COURT VIOLATED APPELLANT'S DUE PROCESS RIGHTS BY SUBJECTING [HER] TO UNREASONABLE DELAYS, REPEATED PRETRIAL PROCEEDINGS, AND INCONSISTENT OVERSIGHT, RESULTING IN A FAILURE TO TIMELY ADDRESS CUSTODY AND VISITATION IN VIOLATION OF OHIO LAW AND FUNDAMENTAL FAIRNESS.

{¶ 34} Father's Second Assignment of Error:

{¶ 35} THE TRIAL COURT VIOLATED FATHER'S DUE PROCESS RIGHTS BY SUBJECTING HIM TO UNREASONABLE DELAYS, REPEATED PRETRIAL PROCEEDINGS, AND INCONSISTENT OVERSIGHT, RESULTING IN A FAILURE TO TIMELY ADDRESS CUSTODY AND VISITATION.

{¶ 36} In their respective second assignments of error, Mother and Father both argue that the juvenile court violated their due process rights by failing to rule on their motions for visitation for more than a year. The parents contend that this case was unreasonably prolonged by nearly a year of pretrials, the changing of the presiding magistrate, the appointment of two different GALs, and the more than two-month delay in the issuance of the Magistrate's Decision following the January 30, 2025 motion hearing. Mother and Father assert the aggregate delay has prejudiced their ability to maintain a relationship with E.T.J.

{¶ 37} We note that this argument is being raised for the first time on appeal. It was not raised as an objection to the Magistrate's Decision or at any other time in the

record before us. Therefore, other than a claim of plain error, the issue is forfeited for purposes of appeal. *See in re Mi.H.*, 2011-Ohio-4736, ¶ 13 (9th Dist.).

{¶ 38} Mother and Father have not specifically argued plain error. Furthermore, neither has identified whether they are making a procedural due process or substantive due process argument. It is not this court's duty to create an argument for them. *See In re L.S.*, 2018-Ohio-5116, ¶ 51 (9th Dist.); *Neyer Holding II, Inc. v. Huang*, 2025-Ohio-1776, ¶ 84.

{¶ 39} Based on the record before us, we find no error in how the juvenile court proceeded on Mother's or Father's motions for visitation. "[A] juvenile court has the inherent power to manage the course of its proceedings and docket." *In re C.L.H.*, 2017-Ohio-2925, ¶ 18 (12th Dist.). Here, the record reveals delays caused by problems serving motions on Mother's husband, the presumed legal father of E.T.J. up until Father's paternity was established in January 2024. Proceedings were further delayed, without objection by Mother or Father, at the request of Maternal Grandmother and the Nonrelative Caregiver and to allow for mediation to try to resolve the parties' disputes. Though a medical emergency required the appointment of a new GAL and a second magistrate became involved in the case at the time of the motion hearing, there is no indication that these events delayed proceedings or impacted Mother's and Father's due process rights. While the parties' motions remained pending, the court put into place various temporary orders for visitation.

{¶ 40} Given the record before us, and the discretion that a juvenile court has in the management of its docket, we find that the juvenile court did not abuse its discretion or otherwise err in the manner in which it presided over Mother's and Father's motions for visitation. Furthermore, the record does not indicate that Mother and Father were

prejudiced by the court's delay in ruling on their motions. Rather, if anything, the delay benefitted the parents as it allowed them additional time to make progress in their sobriety and treatment. Had the hearing on Mother's and Father's respective motions occurred sooner in time, they would not have been able to demonstrate the same level of progress, as they would not have been as far removed from their criminal activity or drug use. The progress and work the parents did while their motions for visitation remained pending did not go unnoticed by the juvenile court. The court praised the parents for their commendable progress and expressed a willingness to revisit visitation in a year so long as they maintained their sobriety and stability.

{¶ 41} Accordingly, for the reasons stated above, we find no merit to Mother's and Father's arguments and overrule their respective second assignments of error.

### C. Father's Paternal Rights

{¶ 42} Father's Third Assignment of Error:

{¶ 43} THE TRIAL COURT ERRED IN FAILING TO RECOGNIZE AND PROTECT THE FATHER'S RIGHTS ONCE PATERNITY WAS ESTABLISHED, INSTEAD RELYING ON CIRCUMSTANCES PREDATING PATERNITY AND DISREGARDING HIS REHABILITATION, STABILITY, AND ABILITY TO PROVIDE A RELATIONSHIP WITH HIS SON.

{¶ 44} In his third assignment of error, Father argues that with the establishment of his paternity of E.T.J., he was entitled to his "full legal rights as a father," which includes visitation with his son. Father maintains that the juvenile court should not have relied on "pre-paternity allegations to justify denying him contact with his son."

{¶ 45} We construe Father's objection to the magistrate's decision to have preserved this issue for appeal. Nonetheless, we find no merit to Father's argument. At

the time Father's paternity was established in January 2024, E.T.J. had already been adjudicated a dependent child and a court order had placed him in the legal custody of the Nonrelative Caregiver. These events circumscribe Father's parental rights and subject his rights to being balanced against E.T.J.'s best interests. *See In re M.E.*, 2013-Ohio-2562 (10th Dist.). In determining whether Father should be permitted visitation with E.T.J., the juvenile court was required to consider the totality of the circumstances. *Id.* at ¶ 26. This included Father's history of criminality, his gambling addiction, and his substance abuse issues.

{¶ 46} Father argues the juvenile court failed to consider his "demonstrated rehabilitation and stability." Father's argument is essentially the same argument previously set forth in his first assignment of error. As already discussed, the record shows that the juvenile court acknowledged Father's progress in addressing his criminality, gambling, and sobriety issues but ultimately concluded that additional time was needed before visitation could be ordered. The juvenile court was concerned that Father's period of improvement had occurred only over a short period of time and while he was under court supervision and sanctions. Given the totality of the circumstances and the evidence presented during the January 30, 2025 motion hearing, we find that the juvenile court did not abuse its discretion or otherwise err in its denial of Father's motion for visitation. The court appropriately considered all relevant evidence, including evidence relevant to Father's sobriety struggles and criminal activity prior to his paternity being established. Father's third assignment of error is, therefore, overruled.

## IV. CONCLUSION

{¶ 47} Having found no merit to the assignments of error raised by Mother or Father, we hereby uphold the juvenile court's denial of Mother's and Father's respective

motions for visitation.

{¶ 48} Judgment affirmed.

M. POWELL and SIEBERT, JJ., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Butler County Court of Common Pleas, Juvenile Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Mike Powell, Judge

/s/ Melena S. Siebert, Judge